Gerald WANNA, Plaintiff and Appellant,

v.

Ivan E. MILLER and Loverna G. Miller,
d/b/a the Museum Bar, Defendants,

and

John Wanberg, d/b/a the Model Tavern,
Defendant and Respondent.

No. 8226.

Supreme Court of North Dakota.

Aug. 17, 1965.

Rehearing Denied Sept. 13, 1965.

564

Thompson & Rutten, Devils Lake, for appellant.

Palda, Palda, Peterson & Anderson, Minot, for respondent.

ERICKSTAD, Judge.

This is an appeal by the plaintiff, Gerald Wanna, from a judgment entered in favor of the defendant John Wanberg, doing business as the Model Tavern, for the dismissal of the plaintiff's complaint, pursuant to the order of the district court of the same date. Trial de novo is demanded.

In his complaint Mr. Wanna sought the recovery of damages under Section 5-01-21 of the North Dakota Century Code. The essence of the complaint, as it related to Mr. Wanberg, was that on October 6, 1962, while Mr. Wanberg was the owner and operator of the Model Tavern, Donald W. Lund was served intoxicating beverages therein when it was apparent that Mr. Lund was or would become intoxicated and when his intoxication was well known or should have been known; that thereafter, while in an intoxicated condition, Mr. Lund drove his truck at an excessive rate of speed and while not under control, causing the truck to collide with the rear end of Mr. Wanna's automobile, which was parked on the east edge of the north-bound traffic lane on the shoulder of U. S. Highway 2 approximately one mile south of the city of Towner in McHenry County, North Dakota; that, as a result of this collision, Mr. Wanna was very seriously injured, from which injuries he suffered great pain and mental anguish, and become sick, sore, lame, and permanently disabled; that his automobile was destroyed and, as a further result, he was required to incur expenses for medical, hospital, and other care and services; and that he was therefore entitled to recover $3,000 in special damages and $125,000 in general damages from Mr. Wanberg.

The defendant Mr. Wanberg admitted that he was the owner and operator of the Model Tavern. For purposes of this appeal we may say that he denied all of the other material allegations of the complaint and for his further answer alleged that for valuable consideration, Mr. Wanna had executed a release of all claims; alleged that if the plaintiff had sustained injuries and damages, the injuries and damages were the result of the plaintiff's negligence, which contributed to and was the proximate cause thereof; and alleged, as a separate affirmative defense, that the injuries and damages complained of by the plaintiff were proximately caused by a new, independent, and intervening cause.

It should be noted that, although the action was commenced against Ivan E. Miller and Loverna G. Miller, doing business as the Museum Bar, and John Wanberg, doing business as the Model Tavern, on motion for summary judgment on behalf of the Millers, the district court granted summary judgment dismissing the complaint as to said defendants on April 7, 1964. No appeal has been taken from that judgment.

We are basically concerned with two statutes in this case. The first, Section 5-01-21 of the North Dakota Century Code, is sometimes referred to as the "Civil Damage Act" or the "Dram Shop Act." This statute reads as follows:

> 5-01-21. Recovery of damages for illegal sale of liquor.—Every wife, child, parent, guardian, employer, or other person who shall be injured in person, property, or means of support, by any intoxicated person, or in consequence of intoxication, habitual or otherwise, of any person, shall have a right of action, in his or her own name, against any person who, by selling, bartering, or giving away alcoholic beverages contrary to the provisions of any statute, shall have caused the intoxication of such person, for all damages actually sustained as well as for exemplary damages. All damages recovered by a minor under this section shall be paid either to such minor, or his or her parent, guardian, or next friend,

as the court shall direct. All suits for damages under this section shall be by civil action in any of the courts of this state having jurisdiction thereof.

North Dakota Century Code.

The material portion of the second statute reads as follows:

5-05-09. Regulations governing sale. —No person in this state shall sell or deliver alcoholic beverages to a person under the age of twenty-one years, an incompetent person, a habitual drunkard, or an intoxicated person. * * *

North Dakota Century Code.

The pertinent portion of another statute in effect when this cause of action arose reads as follows:

39-20-07. Interpretation of Chemical Tests.—Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor, evidence of the amount of alcohol in the person's blood at the time of the act alleged as shown by a chemical analysis of his blood, breath, saliva or urine is admissible. For the purpose of this section:

\* \* \* \* \* \*

3. A person having, at that time, ten-hundredths of one per cent or more by weight of alcohol in his blood shall be presumed to be under the influence of intoxicating liquor;

\* \* \* \* \* \*

North Dakota Century Code.

Under this statute a person having ten hundredths of one per cent (.10%) or more by weight of alcohol in his blood is presumed to be under the influence of intoxicating liquor.

In the instant case Dr. Richard W. Prouty, State Toxicologist for North Dakota

and Associate Professor of Toxicology at North Dakota State University, by deposition testified that he analyzed a specimen of blood which he personally collected from the State Toxicology Department's mailbox in the Branch Postoffice at North Dakota State University at 9:30 a. m. October 8, 1962; that the specimen was received in a cardboard mailing tube addressed to the State Toxicology Laboratory, University Station, Fargo, North Dakota; that the blood was contained in a glass tube with a cork closure and was sealed with tape; and that written on the tape was the following: "Donald Lund, Tioga, 10-7-62, 5:00 A.M."

Dr. Prouty further testified that the specimen was accompanied by Toxicology Form 104, which read, in part: "Donald Lund, aged 34, Tioga, North Dakota. Specimen is venous blood, the sample site is elbow. Specimen obtained at 5:10 A.M., 10-7-1962. Request is that the specimen be analyzed for ethyl alcohol content." He stated "that it is indicated on the form that a nonalcoholic, nonvolatile disinfectant was used on the skin"; "that the specimen was sealed by J. V. Eylands, M.D." ; that the form accompanied the blood specimen in the sealed cardboard container; and that at the time the specimen was received he assigned it a number which was placed upon the form, upon the sample container, and upon all the pertinent records.

He said that he performed a dichromate oxidation test for the determination of alcohol in the blood and found that the Lund blood specimen contained .15 per cent alcohol by weight.

Dr. Prouty was then asked to give his medical opinion of the alcoholic content as of 10:30 p.m. of the blood of a person who weighed 185 pounds; who had eaten nothing other than a piece of cake or pie and coffee at 3:00 p.m.; who had started drinking beer and whiskey mixed with 7-Up at 4:00 p.m. and who consumed his last alcoholic drink at 9:00 or 9:30 p.m.; and whose blood tested .15 per cent alcohol by

weight at 5:00 a.m. the following morning. His opinion was that such an individual would have a blood alcohol level in the range of .22 to .29 per cent by weight, or an average of approximately .25 per cent alcohol by weight. When asked to give the symptoms of a person who had a .22 per cent blood alcohol level, the doctor said:

An individual who has a .22% blood alcohol will most definitely, in my opinion, be one that is characterized as a person in the advanced stages of intoxication. This individual will, in my opinion, most definitely be markedly under the influence of intoxicating beverages. At this stage of intoxication the individual will have a most definitely impaired gait; his vision will be retarded, that is, his visual acuity will be impaired; the peripheral or side vision of this individual will be greatly restricted, that is to say that his angle of vision to the side will be much less than when not under the influence of intoxicating liquor; the motor reflexes of an individual with such a blood alcohol concentration will be most greatly or most definitely impaired or retarded, that is to say that the reaction time that is required for a given motor response or muscular movement of such an individual will be greatly increased. The judgment of an individual at this stage of intoxication is impaired, that is, the time to make a decision is increased, and the judgment is poor as compared to their normal state in the absence of alcohol. In summation of this individual, in my opinion he would be markedly intoxicated.

When asked his opinion of approximately how many ounces of alcohol would cause a person to reach the minimum range of .22 per cent alcohol by weight, the doctor said that a person who weighed 185 pounds and tested .22 per cent alcohol by weight would have in his body at the time the blood speci-

men was drawn a minimum of "twelve ounces of 100 proof liquor, or the amount of alcohol that would be present in twelve 5% bottles of beer."

In connection with oxidation of alcohol, Dr. Prouty said:

The average rate of metabolism or burning up of the alcohol was taken into consideration in my statement on intoxication and is included, that is why a range was given, rather than an exact figure. It has been experimentally determined by others, as well as by me, on persons—subjects in these controlled experiments, that different individuals will metabolize or burn up or eliminate the alcohol at different rates, and this will vary over a relatively low range, and the figures are between—that is, an individual will burn approximately one ounce of 100 proof whiskey, or the alcohol that is present in one twelve ounce bottle of 5% beer, per hour, and this will be reflected as a decrease in the blood alcohol level from approximately .01 to .02 per cent per hour, and that is why I gave the range of .22% to .29% for this given individual under those circumstances as presented.

Dr. Prouty's testimony strongly supports the conclusion that Mr. Lund was intoxicated at the time of the last sale or delivery of an alcoholic beverage to him in the Model Tavern and also at the time of the collision which caused Mr. Wanna's injuries, in light of the testimony of both Mr. Lund and Mr. Lalim showing that Mr. Lund consumed no alcoholic beverage between 10:00 p. m. October 6, 1962, when he consumed his last drink at the Model Tavern, and 5:00 a. m. October 7, 1962, when the blood specimen was extracted from him in the hospital at Rugby.

* * * Intoxication may be evidenced circumstantially by prior or subsequent condition of intoxication within such a time that the condition may be supposed to be continuous. 2

Wigmore, Evidence, 3d Ed. § 235. This accords with our rule that an inference may be and often is retroactive; a trier may from present conditions infer a previous fact. Cross v. Passumpsic Fibre Leather Co., 90 Vt. 397, 407, 98 A. 1010.

Ackerman v. Kogut, 117 Vt. 40, 84 A. 2d 131, at 134.

There is much other evidence of Mr. Lund's intoxication.

The record shows that Mr. Lalim, who had one drink with Mr. Lund in the Model Tavern at Tioga just shortly before leaving Tioga with him for the east, said that Mr. Lund "talked kind of funny," that "his tongue was heavy," that "he might have been rowdy," and that because he thought Mr. Lund was intoxicated, he (Mr. Lalim) drove the Lund pickup truck from Tioga to just outside Minot.

Inez Thorstenson, the record librarian for the Good Samaritan Hospital at Rugby, where Mr. Lund was admitted at 5:00 a. m. October 7, 1962, testified by deposition that the hospital records show that Mr. Lund "smelled heavily of alcohol at time of admission." (This was taken from history portion of the records.) She also said: "This also appears on nurse's notes—odor of alcohol about person."

Mr. LeRoy G. Fred, the State Highway Patrolman who investigated the accident and arrived at the scene only a few minutes after the collision occurred shortly after 1:00 a. m. October 7, 1962, testified that on his arrival Mr. Lund was staggering, his speech was slurred, there was a smell of alcohol about his person, and in his (Mr. Fred's) opinion Mr. Lund was intoxicated. It should be noted that it was brought out on cross-examination that Mr. Lund was bleeding from the forehead and that this could have caused him to stagger and slur his speech. It does not, however, account for the odor of alcohol. Mr. Lund's injuries were not serious, as he was admitted

to the hospital in Rugby at 5:00 a. m. and released later the same morning.

Mr. Lund himself admitted having drunk a considerable amount of intoxicating liquor in Tioga, first in the Museum Bar and then in the Model Tavern, from about 5:00 p. m. to 9:00 or 9:30 p. m. October 6, 1962. On being examined by the court, he said he arrived at the Museum Bar sometime after 5:00 p. m.; that there he had three or four beers while waiting for Mr. Lalim; that after Mr. Lalim arrived he had another beer; that he left the Museum Bar about 7:30 p. m. and went to the Model Tavern, where he had "two, three beers and a couple Seven-Sevens."

The only witnesses who testified that they believed Mr. Lund not to be intoxicated while in the liquor establishments were the owners and employees of the businesses.

Irene Lee, who was a barmaid in the Museum Bar, testified by deposition that she saw Mr. Lund on October 6, 1962, at the Museum Bar, but that because the bar is 40 to 50 feet long and she worked at one end and Mr. Lund was at the other end, she did not speak to him and did not recall anything as to his condition.

Mr. Ivan E. Miller, owner of the Museum Bar, testified that he saw Mr. Lund only once on October 6, 1962, and that was between 9:00 and 10:00 p. m., when he, being off duty, came to the bar and at that time cashed a check for Mr. Lund. He saw nothing out of the ordinary in his appearance.

Mrs. Loverna G. Miller, the wife of the owner of the Museum Bar, testified by deposition that she recalled seeing Donald Lund between 7:00 and 7:30 p. m. in the Museum Bar, that he had only one beer and then left after Lester Lalim left. She later saw Mr. Lund about 9:30 in the Museum Bar when he cashed a check. She did not talk to him then but did not think he was intoxicated.

Mae Iwen, an employee at the Model Tavern, did not remember whether she had

seen Mr. Lund or Mr. Lalim on October 6, 1962, at the Model Tavern, but thought she had seen them there. She did not remember whether they had been drinking there or not.

Mr. Andrew Heen, whose wife was Mr. Wanberg's cousin, lived in Enumclaw, Washington, but visited in North Dakota in the summer and during this time helped Mr. Wanberg. He came on duty at 9:00 or 9:15 p. m. October 6, 1962, at the Model Tavern. He said Mr. Lalim and Mr. Lund came into the Model Tavern after he came on duty, that he did not remember selling them anything to drink at that time, that they stayed only a short while, and that they talked about their planned trip east to get potatoes. He said he thought Mr. Lund had had something to drink but that he would not say he was drunk. He said he knew Mr. Lund "had a drink, maybe two, three, four or five during the day * * *."

■ Our view of the entire evidence is that Mr. Lund was markedly intoxicated when last sold or delivered an alcoholic beverage in the Model Tavern; thus, Section 5–05–09 of the North Dakota Century Code, prohibiting the sale or delivery of alcoholic beverages to an intoxicated person, was clearly violated.

It is argued by Mr. Wanberg that Dr. Prouty's testimony should not have been received. The objection made at the time of the taking of the doctor's deposition was stated as follows:

* * * We object to the testimony of Dr. Prouty, and wish to have a continuing objection to his testimony in this case on the ground that there is no foundation for his testimony; that Mr. Lund was not properly under arrest at the time; that the taking of the blood sample was not administered as directed by law pursuant to Chapter 39–20, and particularly Chapter 39–20–01, among other things; that the alleged crime was not committed in the presence of the arresting officer, therefore, it being an unlawful arrest in violation of 29–06–15, and Colling v. Hjelle, [N.D.], 125 N.W.2d 453.

■ As the record shows that Mr. Lund voluntarily submitted to the extraction of a blood specimen for alcohol content test purposes, the provisions of Chapter 39–20 of the North Dakota Century Code, requiring that a person be placed under arrest and informed that he will be charged with the offense of driving or being in actual physical control of a vehicle upon the public highways while under the influence of intoxicating liquor before the person may be asked to take a test which, if refused, may be cause for revocation of his driver's license, do not apply. Colling v. Hjelle, N.D., 125 N.W.2d 453, for the same and other reasons does not apply.

■ The objection that the extraction of blood was not voluntarily submitted to is in any case available only to Mr. Lund. The Court of Criminal Appeals of Oklahoma seems to be in accord with this view. This court has held that the right to attack the validity of a search and seizure and assert immunity therefrom is a personal matter, which may be raised only by the person whose personal effects are subjected thereto. It cannot be raised by a third person. Kyle v. State, 366 P.2d 961 (Okl. Crim.1961). The Supreme Court of the United States has clearly defined the person who is entitled to raise the objection:

In order to qualify as a "person aggrieved by an unlawful search and seizure" one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.

Jones v. United States, 362 U.S. 257, at 261, 80 S.Ct. 725, at 731, 4 L.Ed.2d 697, 78 A.L.R.2d 233.

Mr. Wanberg is, therefore, in no position to make this objection. Our view of the evidence is, however, that Mr. Lund voluntarily submitted to the extraction of the blood specimen for test purposes.

■ The hypothetical question asked Dr. Prouty was based on the evidence and thus was proper.

The rule is well established that, in propounding a hypothetical question to an expert, a party may assume as proved all the facts which the evidence tends to prove, and the court should not reject the question on the ground that in his opinion such facts are not established by a preponderance of the evidence. It is also the rule that a failure to properly formulate the hypothetical question which justifies rejection must be a failure in some one or more important data, not merely in a trifling respect. * * *

Lyon v. Dr. Scholl's Foot Comfort Shops, 251 Minn. 285, 87 N.W.2d 651, at 658. See, also, Smith v. Twin City Motor Bus Co., 228 Minn. 14, 36 N.W. 2d 22.

■ The blood specimen was extracted from Mr. Lund's vein near the elbow by Mr. Marvin Modrow, who was an x-ray technician and assistant laboratory technician at the Good Samaritan Hospital at Rugby. Although he did not remember specifically taking the specimen of blood, he said that he had checked the hospital records and found that he had done so. He explained the usual procedure by which blood for this purpose is extracted, marked, and mailed to the State Toxicologist. The procedure appeared proper, and our attention has not been drawn to any irregularity. The extraction of blood having been voluntary and proper safeguards having been taken in the extraction, marking, handling, mailing, receiving, and analysis of the specimen, we find no merit in the objection of no foundation for Dr. Prouty's testimony in regard to the alcohol content of the specimen of Mr. Lund's blood or his opinions partially based thereon.

Mr. Wanberg's brief contains this further argument:

There is a further lack of proof in Plaintiff-Appellant's case, in that there is no concrete evidence that Donald Lund's last drink was purchased in Defendant-Appellee's bar and that he may have been given this drink or previous drinks by some other person who had purchased the same rather than Donald Lund.

■ Our Civil Damage Act does not require that a claimant thereunder prove that an intoxicated person received his last drink at the defendant's place of business. It is sufficient if it be proved that a defendant who is engaged in the business of selling alcoholic beverages sold, bartered, or gave away an alcoholic beverage contrary to law (in this instance sold or delivered an alcoholic beverage to an intoxicated person) and that the damages complained of resulted from the intoxication of the person who was sold, bartered, or given the alcoholic beverage.

■ Our view of the entire case is that Mr. Lund was sold or delivered an alcoholic beverage while in the tavern owned by the defendant, Mr. Wanberg, when Mr. Lund was markedly intoxicated; that thereafter, while intoxicated, Mr. Lund drove his pickup truck in such a negligent manner that it collided with the left rear end of the plaintiff Wanna's automobile, which was parked on the east shoulder of U. S. Highway 2, facing in a northerly direction, approximately one mile south of Towner, North Dakota; that the lights (including the taillights) of Mr. Wanna's automobile were on at the time of the collision; and that Mr. Wanna, who was standing at the rear of his automobile while trying to jack up the left rear wheel so that the tire could be changed, was struck by Mr. Lund's vehicle, which was traveling in a northerly direction, and, as a result, Mr. Wanna suf-

fered severe personal injuries and damage to his property for which he is entitled to recover money damages from the defendant tavern owner.

We find no evidence that Mr. Wanna was negligent or that his negligence contributed to his injuries and damages. In order to jack up the left rear end of his automobile it was necessary for him to stand at the rear of the vehicle. Testimony of Mr. Arlan Haman, a person who happened on the scene very shortly after the collision, is that the Wanna vehicle's headlights and taillights were on when he arrived at the scene and that he turned them off to avoid a fire which might have resulted from leaking gasoline in the damaged section of the automobile.

What we have said in this case concerning contributory negligence is not to be construed as a holding that contributory negligence is or is not a defense under our Civil Damage Act.

For the reasons stated herein the judgment of the trial court is reversed, and the case is remanded for proper determination by the trial court of damages to be awarded the plaintiff, Mr. Wanna.

BURKE, C. J., and STRUTZ, TEIGEN and KNUDSON, JJ., concur.