STATE of North Dakota, Plaintiff
and Appellee,

v.

Bradley Ray HARTSOCH, Defendant
and Appellant.

Cr. No. 842.

Supreme Court of North Dakota.

Jan. 14, 1983.

Kent Reierson, Asst. State's Atty., Williston, for plaintiff and appellee State of N.D.

Ella Van Berkom, Minot, for defendant and appellant.

VANDE WALLE, Justice.

Bradley Hartsoch appealed from a judgment of conviction entered against him by the Williams County district court following a trial by jury in which he was convicted of the crime of aggravated assault in violation of Section 12.1–17–02(2) and (4) of the North Dakota Century Code. We affirm.

On October 30, 1981, Hartsoch was charged by criminal information with the crime of aggravated assault. The charge arose out of an incident which occurred in McGregor, North Dakota, on October 5, 1981. According to the testimony of Fred Romig and John Rush, who were the victims of the assault, Hartsoch fired a shotgun into the pickup occupied by the two men after he and a companion, Charles Cummings, had chased Romig and Rush from an oil-drilling site near Tioga, North Dakota, to an apparently unoccupied house in McGregor.

The episode in McGregor was the result of a series of events which began when Romig and Rush inquired about a job at the oil rig where Hartsoch worked. In response to their inquiry, the on-duty driller, Cary Olson, informed Romig and Rush that no jobs were available and then asked them to leave because he was busy with work. Just

after they left the drilling site, Olson discovered his wallet was missing and sent Hartsoch and Cummings after Romig and Rush, who he believed had taken it. As it turned out, Romig and Rush did not have the billfold; it later was found on the floor in the building where Olson changed clothes for work.

Hartsoch and Cummings stopped Romig and Rush a short distance from the drilling site. Romig, who was driving, had missed a turn, turned around, and was heading back in the direction of the oil rig when Hartsoch and Cummings, who were headed in the opposite direction, flashed the lights of their pickup in an obvious attempt to get Romig and Rush to stop. Both pickups stopped upon meeting each other at an intersection so that the driver's side of one vehicle faced the driver's side of the other vehicle.

Both Romig and Rush testified that Cummings was driving the vehicle he and Hartsoch occupied, but Hartsoch and Cummings testified that Hartsoch was driving. Romig became frightened by certain movements in the other pickup and fled toward McGregor with Hartsoch and Cummings in pursuit.

There were shots fired at Romig and Rush from the pursuing vehicle, one of which flattened a rear tire.[1] Romig continued driving with the flat tire into McGregor and stopped at the previously mentioned unoccupied house. Romig began to get out of the pickup when the pursuing pickup stopped behind them and Hartsoch jumped out, carrying a shotgun. Upon seeing Hartsoch running toward them with the shotgun, Romig reentered the pickup and drove off around the corner of the house. It was just as Romig was driving off that Hartsoch fired at them with the shotgun he was carrying.

There was a conflict in the testimony at trial concerning the direction in which Hartsoch fired the shotgun. Romig and Rush testified that Hartsoch shot into the cab of the pickup, whereas Hartsoch testi-

fied he shot into the ground behind the departing pickup in an attempt to flatten the other rear tire. Cummings testified that he didn't see the direction of Hartsoch's shotgun blast but believed, because of Hartsoch's position in relation to the departing vehicle, that Hartsoch couldn't have shot into the cab.

Hartsoch does not dispute that Romig and Rush were injured by a shot or shots from a firearm as they drove away from him; however, Hartsoch does dispute that he was the cause of the injuries the two men suffered. Hartsoch's theory is that there were shots fired by someone else which caused Romig's and Rush's injuries. This is a matter which we will consider later.

Hartsoch raises the following issues on appeal:

1. Did the district court err in admitting in evidence State's Exhibit 1, a vent window frame from the pickup which Romig was driving?

2. Did the district court err in permitting the jury to view the pickup which Romig was driving?

3. Did the district court err in remarking to the jury that "It's costly to conduct a trial, you know; and, if we have to declare a mistrial, it's a costly matter so if there's a possibility of a verdict, we'd like to have you render it."

4. Did the district court err in permitting the court reporter to read to the jury testimony of Romig and Rush?

5. Did the district court err in reading to the jury parts of the jury instructions as well as the criminal information against Hartsoch?

6. Did the district court err in inquiring of the jury foreman whether or not he understood the information he had just read to the foreman?

7. Did the district court err in referring to Romig and Rush as "victims" at various times during the course of the trial?

---

1. Romig and Rush testified there were three or four shots fired at them; Hartsoch and Cummings testified only one or two shots were

fired, and those by Cummings, but only with the intention of flattening the rear tire.

8. Was there sufficient evidence to support the jury's verdict of guilty?

### I

The first of Hartsoch's arguments is that the trial court erred in admitting in evidence the vent window frame from the pickup driven by Romig because the State failed to establish a proper "chain of custody" for the frame.

■ Whether or not demonstrative evidence is admissible·in evidence is within the sound discretion of the trial court, and its decision to admit or exclude evidence will not be interfered with on appeal unless the court is shown to have abused its discretion. *State v. Berger*, 285 N.W.2d 533 (N.D.1979).

■ An unbroken chain of custody is not necessarily a condition for the admissibility of evidence. If the trial court is reasonably satisfied that the item offered is what it is purported to be and that the condition of the item is substantially unchanged, it is properly admissible in evidence [*Berger, supra*, 285 N.W.2d at 540]; and any defects in the chain of custody at that point go to the weight of the evidence, rather than admissibility [*Berger, supra*, 285 N.W.2d at 540; *United States v. Brewer*, 630 F.2d 795 (10th Cir.1980); *United States v. Lampson*, 627 F.2d 62 (7th Cir.1980); *United States v. Henderson*, 588 F.2d 157 (5th Cir.1979), *cert. denied* 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979); *United States v. White*, 569 F.2d 263 (5th Cir.1978), *cert. denied* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978)].

■ The trial transcript shows that well before State's Exhibit 1 was offered in evidence, Hartsoch testified on direct examination that the windows on both the driver's and the passenger's side of the "Romig pickup" were shattered and had fallen into the cab of the pickup when he closed the doors after searching the interior of the cab for Olson's wallet following the shooting in McGregor. When it was offered in evidence, the vent window frame at issue had no glass in it except for bits of shattered glass around the inside border of the frame; it was basically in the condition Hartsoch described the windows to be on October 5, 1981.

Furthermore, Jim Quickstad, a detective with the Williams County sheriff's department, examined the frame and testified that he could see (1) what he thought to be the outer coating of a bullet which could not have been fired from a shotgun, and (2) an indentation which he implied was caused by a BB shot.

It would not have been unreasonable for the trial judge to conclude that these features of the vent window frame were the same as on October 5, 1981, in view of the fact that both Hartsoch's and the State's theory concerning the cause of Romig's and Rush's injuries included the firing of some sort of firearm into the cab of their pickup.

Finally, Rush testified that he removed the frame from the pickup he and Romig had been traveling in on October 5, 1981, and that it was in the same basic condition as it was on October 5, 1981.

Considering the various circumstances which attended the receipt of State's Exhibit 1 in evidence, we are satisfied that the trial court did not abuse its discretion in admitting the vent window frame in evidence.

Hartsoch points out that between October 5, 1981, and February 16, 1982, the date of trial, there is no record of where the pickup and its parts had been kept, who had handled it, and what changes, if any, had occurred in its condition. However, once the trial judge concludes it is reasonably probable that the item being offered in evidence is what it purports to be and is in substantially the same condition, any defects in the chain of custody are matters which go to the weight of the evidence but do not affect its admissibility.

### II

■ Next, Hartsoch argues the trial court erred by allowing the jury to view the pickup in which Romig and Rush were injured, and by mentioning the extra cost involved in a new trial when the court

remarked to the jury that "if there's a possibility of a verdict, we'd like to have you render it."

Our review of the record discloses that Hartsoch did not object at trial to the jury's viewing of the pickup or to the presently complained-of comments by the trial judge to the jury.

In *State v. McLain,* 301 N.W.2d 616, 624 (N.D.1981), Justice Paulson, speaking for a unanimous court, precisely and clearly stated: "An issue or contention not raised or considered in the trial court cannot be raised for the first time on appeal."

Hartsoch's counsel not only did not object to the jury's viewing of the pickup but she explicitly stated in response to the trial court's inquiry that she had no objection to it. When Hartsoch effectively consented to the viewing of the pickup, he waived his right to present the issue for appellate review.

■ Although the issue of whether or not the trial judge erred in his remarks to the jury with respect to the additional expense of a new trial is not properly before this court, we are inclined to comment that in our view no error was committed.

■ The test generally applied to determine if remarks by the court to the jury are improper or coercive, as Hartsoch suggests the trial court's remarks were in this case, is to examine them in light of the totality of the circumstances to see if they had a coercive effect on the jury. See *State v. Mostad,* 70 N.D. 73, 291 N.W. 910 (1940); *United States v. Smith,* 635 F.2d 716 (8th Cir.1980); *United States v. Beattie,* 613 F.2d 762 (9th Cir.1980), *cert. denied* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); *State v. Hawk,* 292 N.W.2d 346 (S.D.1980).

■ In view of (1) the relatively mild nature of the remarks, and (2) the trial judge's statement immediately following them that "If you can't [render a verdict], of course, you can't," we believe the court's comments did not have a coercive effect on the jury.

## III

We turn now to a consideration of Hartsoch's next three allegations of error concerning further communications between the trial court and the jury after it had retired for deliberation.

The record is not clear whether the jury returned to the courtroom after deliberating for approximately eight hours to give its verdict in the State's case against Cummings, or whether it returned to request information from the court to aid in its deliberations with regard to Hartsoch. Whatever the jury's reasons for returning, it became apparent to the court that the jury desired some information.

■ In particular, one of the jurors requested to have read to her Romig's testimony having to do with Hartsoch's position in relation to the pickup Romig was driving after it had stopped at the abandoned house in McGregor. In response to the request, the trial judge asked the court reporter if she could find the testimony, whereupon the court reporter read approximately four pages of Romig's testimony and approximately a page of Rush's testimony. Those parts of Romig's and Rush's testimony read to the jury particularly concerned Hartsoch's actions and movements, as well as their own, from the time Hartsoch stopped behind Romig and Rush in McGregor until just after he fired the shotgun. This in substance is what the juror requested.

Hartsoch now claims the trial court erred in (1) permitting the testimony at issue to be read to the jury because it unduly emphasized Romig's and Rush's testimony, and in (2) permitting testimony to be read to the jury which was not specifically requested, namely, Rush's testimony.

Section 29–22–05, N.D.C.C., dispenses with Hartsoch's first claimed error. It states:

"After the jurors have retired for deliberation, if they desire to be informed on a point of law arising in the cause, or to have any testimony about which they are in doubt or disagreement read to them, they, upon their request, must be

conducted into the courtroom by the officer who has them in custody. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the state's attorney and the defendant or his counsel, or after they have been called."

Whether or not testimony is emphasized by being read to the jury is an inescapable potential consequence of Section 29–22–05 which unequivocally directs the testimony be given at the jury's request.

■ Hartsoch's second claimed error under discussion calls attention to the fact that Rush's testimony was not requested. There was some confusion between the trial judge and the jury foreman when the jury foreman initially requested testimony to be read. Apparently conscious of this confusion, the jury foreman asked the juror who wanted the information to make the request. Although the juror specifically asked for Romig's testimony, the gist of the question she wanted answered was: What was Hartsoch's position relative to Romig and Rush at the abandoned house in McGregor?

Where testimony of a specific witness regarding a particular incident is asked to be read to the jury, the trial judge has no transcript he can turn to in order to find the requested information; instead, he must rely on his court reporter to find the relevant testimony. There is no indication in the record that the court reporter prefaced the reading of Rush's testimony with a statement to the effect that it was Rush's testimony. Nor is there a specific objection to the reading of Rush's testimony, only a general objection to the extent of the testimony read in response to the jury's request.

We conclude that because the portion of Rush's testimony read to the jury was less than one page and substantially consistent with the portion of Romig's testimony read to the jury, if any error was committed by the trial court in permitting the reading, it was harmless error. See Rule 52(a), N.D.R. Crim.P.; *State v. Klein,* 200 N.W.2d 288 (N.D.1972).

■ Following the court reporter's reading of the requested testimony, the jury foreman asked the court for another explanation of aggravated assault. In answer to the foreman's request, the court read the criminal information against Hartsoch and pages 14 and 15 of the jury instructions which set forth various definitions and an analytical simplification of the statute defining the offense of aggravated assault. Here, again, Hartsoch claims the trial court erred in communicating this information to the jury.

The trial court committed no error because (1) Section 29–22–05, N.D.C.C., requires the court to inform the jury on any point of law it desires to have explained, and (2) the information actually given to the jury was reasonably calculated to answer the question.

■ Hartsoch's final argument regarding the communications which occurred between the judge and the jury is that the trial court erred by asking the jury foreman whether or not he understood the court's answer to his request for an explanation.

There certainly was no error made in the trial judge's inquiry to the jury foreman. How else is the trial judge to know that the jury's question has been satisfactorily answered and that no serious confusion remains regarding the point of law the jury wished to be informed on? To ask whether or not the jury understands is a simple, reasonable, and logical query following the court's answer to a jury question.

IV

■ Hartsoch argues that the trial court's occasional reference during the course of the trial to Romig and Rush as "victims" constituted error.

As previously noted, Hartsoch did not dispute that Romig and Rush were injured by the discharge of a firearm into the cab of their pickup. A natural reading of the term "victim" in the context of the present case denotes someone who has suffered harm or injury from the acts of some other person. See *Webster's New World Diction-*

*ary,* 2d Ed. (1980), s.v. "victim." By simply using the word "victim" to refer to Romig and Rush, the trial court said nothing about the identity of the person who caused their injuries. The term accurately described Romig and Rush; and Hartsoch does not suggest the trial court improperly hinted or implied that he, Hartsoch, was the cause of Romig's and Rush's injuries. We find no error. See *Lister v. State,* 226 So.2d 238 (Fla.Dist.Ct.App.1969).

## V

Hartsoch's final argument is that there was insufficient evidence to sustain the jury's verdict.

In *State v. Manke,* 328 N.W.2d 799, 805 (N.D.1982), we said:

"[In cases challenging the sufficiency of evidence to sustain a conviction] we do not weigh conflicting evidence, nor do we judge the credibility of witnesses; instead, we look only to the evidence most favorable to the verdict and the reasonable inferences therefrom *to see if there is substantial evidence to warrant a conviction. State v. Cox,* 325 N.W.2d 181 (N.D. 1982); *State v. Olson,* 290 N.W.2d 664 (N.D.1980); *State v. Larson,* 274 N.W.2d 884 (N.D.1979); *State v. Piper,* 261 N.W.2d 650 (N.D.1978); *State v. Allen,* 237 N.W.2d 154 (N.D.1975).

"This statement of the rule appropriately emphasizes that:

"(1) It is the exclusive function of the jury to weigh the evidence and judge the credibility of witnesses. See *State v. Allen, supra,* 237 N.W.2d at 161.

"(2) A jury may find a defendant guilty even though evidence exists which *if believed* could lead to a verdict of not guilty. See *United States v. Lincoln,* 630 F.2d 1313 (8th Cir.1980).

"(3) We must assume the jury believed the evidence which supports the verdict and disbelieved any contrary or conflicting evidence. See *State v. Pieschke,* 295

N.W.2d 580 (Minn.1980)." [Emphasis added.]

Another way of saying we will examine the record to see if there is substantial evidence to support a conviction is:

"[We will] review the record to determine if there is competent evidence that allowed the jury to draw an inference reasonably tending to prove guilt and fairly warranting a conviction." *State v. Olson,* 290 N.W.2d 664, 671 (N.D.1980).

According to the jury instructions, before the jury could find Hartsoch guilty of aggravated assault it had to first find either:

"1. That on or about the 5th day of October, 1981, in Williams County the Defendant caused bodily injury to another human being with a dangerous weapon or other weapon, possession of which under the circumstances indicates an intent or readiness to inflict serious bodily injury and the Defendant engaged in this conduct knowingly;

"or

"2. That on or about the 5th day of October, 1981, in Williams County, the Defendant fired a firearm or hurled a destructive device at another human being and that the Defendant engaged in this conduct willfully."

Hartsoch, in his argument that the evidence presented at trial was insufficient to convict him, makes much of the fact that no BB's were found in the cab of the pickup driven by Romig. A more accurate statement would be that detective Quickstad testified he conducted a cursory examination of the pickup and, although he did not find any BB's, there could have been BB's which he did not see because the interior of the cab was covered with a large amount of shattered glass.[2]

Hartsoch also emphasizes that he, Cummings, Romig, and Rush all testified they heard rifle shots as Romig drove away from the abandoned house.[3] And, according to

---

**2.** Significantly, Romig testified BB's were still in his left shoulder, but, according to the doctor who examined him after he was injured, they would eventually work their way to the skin's surface. Moreover, the jury viewed Romig's shoulder following this testimony.

**3.** There was direct testimony at trial that rifle

detective Quickstad, there were in fact bullet holes in the pickup cab and camper. Hartsoch's obvious theory is that it was the rifle shots fired by someone else, and not the shotgun blast he fired, which caused Romig's and Rush's injuries.

We find in the record that Hartsoch, Cummings, and Rush are in complete agreement that Hartsoch's shotgun blast, in whatever direction it was fired, preceded the rifle shots; there was the shotgun blast, and *then* the rifle shots. But Rush testified he was injured at the instant the shotgun was fired. He stated:

"A. ... As we was going around the side of the house, I looked out the driver's side. I seen a guy raise the gun up, I seen a flash. I flinched and I felt blood run down my face.

"Q. And who was the guy that you saw shoot that?

"A. Brad Hartsoch."

Applying the aforestated principles to the case at hand, we conclude there was sufficient evidence to support the jury's verdict. Accordingly, we affirm the district court's judgment of conviction.

ERICKSTAD, C.J., and PEDERSON, PAULSON and SAND, JJ., concur.

shots were in fact fired as Romig and Rush were driving away from Hartsoch at the abandoned house in McGregor. Marty Grenier, an oil-field employee who worked on the same oil rig as Hartsoch, testified that on October 5, 1981, he followed Hartsoch and Cummings into McGregor. He stopped behind them at the abandoned house and, as Hartsoch was returning to his pickup and Romig and Rush were driving away, a passenger in Grenier's pickup, Duane Lesher, fired two or three shots from a rifle. Grenier testified, however, that he did not know in what direction Lesher fired the rifle. The prosecutor asked: "Could you tell which direction he was firing? Could he have been firing up or to the north or in the air or on the ground?" Grenier answered, "I wasn't watching where he was firing. I was just watching the pickup take off."