**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Alvin T. REIL, Defendant and Appellant.**

**Crim. No. 1210.**

Supreme Court of North Dakota.

June 30, 1987.

Peter H. Furuseth, States Atty. (argued), Williston, for plaintiff and appellee.

Schoppert Law Firm, New Town, for defendant and appellant; argued by Thomas K. Schoppert.

ERICKSTAD, Chief Justice.

Alvin T. Reil appeals from the judgment of conviction entered by the Williams County Court on July 29, 1986, finding him guilty of driving under the influence of alcohol in violation of Section 39–08–01, N.D.C.C., following trial by jury and also from the order denying his motion for new trial. We reverse both the judgment and the order and remand for new trial.

Reil was charged with driving under the influence by Officer Bryon T. Klipfel of the North Dakota Highway Patrol on November 18, 1984. While on patrol, Officer Klipfel observed a pickup traveling on a frontage road which appeared to him to be traveling at a low rate of speed. He turned on the frontage road and followed the pickup for approximately one mile. While following the pickup he saw it wander from the shoulder to the center of the frontage road and at one time cross the center of the road. When the pickup turned off the road, he noticed that the vehicle's brake lights were not working and that the signal lights had not been activated. He turned on the emergency equipment on the patrol car and the pickup came to a stop. He approached the pickup and while he was identifying the driver he detected a strong odor of alcohol on the driver's breath and saw that his eyes were very bloodshot. After Reil failed two physical balance tests and an "ALERT" test, he was taken to the law enforcement center for a Breathalyzer test. Klipfel, a certified Breathalyzer operator, administered the breath test and Reil's test results showed a .10 percent blood-alcohol content.

Following the breath test, when Reil requested an independent blood test Officer Klipfel took Reil to the hospital for such a test. The State subpoenaed the results of that blood test from the State Toxicologist's Office and at trial offered a certified copy of the results of that blood test. The trial court admitted the results of the blood

test over Reil's objection that the State had not established the chain of custody of the blood sample and his contention that the State had the burden of showing that the blood drawn from him was the same blood examined by the State Toxicologist.

On August 1, 1986, Reil moved for a new trial arguing, among other things, that his blood test was received as evidence without proper foundation. On September 16, 1986, the trial court denied Reil's motion for a new trial.

Reil raises three issues on appeal; however, the dispositive issue is whether or not the trial court erred in admitting the result of his blood-alcohol test.

■ Currently, a split of authority exists regarding the chain of custody for the admissibility of blood-alcohol tests as identified by the Alaska Supreme Court in *Sullivan v. Municipality of Anchorage*, 577 P.2d 1070, 1072 (Alaska 1978):

"Courts considering such chain of custody issues have split. Some have strictly required that every link in the chain of evidence be proven before the results would be admissible. These cases express the concern that there be complete evidence that the specimen was properly extracted and clearly identified as the blood of the person being tested. Other courts have held that every step need not be proven to an absolute certainty as long as the circumstances of the test

provide a reasonable assurance that the sample was withdrawn and tested in a reliable manner. Under this view, the ultimate question is whether sufficient evidence was presented to warrant a finding that the blood was in fact extracted from the defendant and was tested in a trustworthy manner." [Footnotes omitted.]

We believe that *State v. Hanson*, 345 N.W.2d 845 (N.D.1984), and the cases cited therein,[1] and subsequent to,[2] are consistent with the second line of authority. In *Hanson* we concluded that the State provided sufficient foundation to admit the results of Hanson's blood-alcohol test where the arresting officer testified that Hanson's blood sample was withdrawn from him under very clean and sterile conditions and described the procedures utilized in handling and mailing the blood sample to the office of the State Toxicologist. In light of the arresting officer's testimony, we concluded that there were sufficient indicia of reliability in the withdrawal of the blood sample in that case to permit the receipt of the results of the blood-alcohol test. 345 N.W.2d at 849.

*Hanson* is readily distinguishable from this case in that the arresting officer, although present when Reil's blood sample was drawn, did not testify as to the procedures used to preserve the blood sample

---

1. In *Hanson* we cited *Wanna v. Miller*, 136 N.W.2d 563 (N.D.1965) and *Erickson v. North Dakota Workmen's Compensation Bureau*, 123 N.W.2d 292 (N.D.1963), as recognizing "the possibility that a blood sample may become contaminated before it reaches the laboratory for chemical analysis." In *Erickson*, 123 N.W.2d 292, 296 (N.D.1963), we stated the foundational requirement for the admissibility of blood-alcohol test results as follows:

"When an object is being used in evidence to prove a fact with which it is related as of a previous time, it is not competent evidence unless it is first shown that such object is in substantially the same condition as it was at the time to which it is being related. *Gutman v. Industrial Commission*, 71 Ohio App. 383, 50 N.E.2d 187. Therefore, in this case, where the alcoholic content of the decedent's blood at the time of the accident is to be shown by a test of a sample of his blood, there must be positive evidence to show that the blood had not been tampered with and that, when the

test was made, the blood analyzed was that which was taken from the body of the deceased. Mere delay will not destroy the evidentiary factor of an object if a proper foundation is laid. But before a material object may be admitted in evidence, it must be shown that there has been no substantial change in its condition since the time in issue, which in this case would require that there be evidence showing that the contents of the container into which the blood had been placed was the same substance that had been withdrawn from the body of the deceased and, except perhaps for clotting, that it was in substantially the same condition. *Witt Ice & Gas Co. v. Bedway*, 72 Ariz. 152, 231 P.2d 952; *White v. Keller*, 188 Or. 378, 215 P.2d 986."

2. *See State v. Vetsch*, 368 N.W.2d 547 (N.D.1985) and *State v. VandeHoven*, 388 N.W.2d 857 (N.D. 1986).

nor did he testify as to its handling and mailing.[3]

In *State v. Vetsch*, 368 N.W.2d 547, 550 (N.D.1985), we acknowledged the legislative directive implicit in the 1983 amendment to Section 39–20–07, N.D.C.C., enacted to facilitate the admissibility of chemical tests by commenting:

"In North Dakota, the legislature in § 39–20–07 has explicitly prescribed that '... evidence of the amount of alcohol ... in the person's blood at the time of the act alleged as shown by a chemical analysis of the blood ... is admissible.' The emphasis in subparagraph 5 is manifest: 'The results of the chemical analysis *must* be received in evidence when it is shown ...' that it was properly obtained and fairly administered. Rule 26, N.D.R.Crim.P., mandates that 'all evidence shall be admitted which is admissible under the statutes of this State, ...' Thus, it was for the court to make the preliminary determination of whether it was properly obtained and fairly administered for statutory admissibility. It was for the jury to assess its relevancy and weight."

In *Vetsch* we concluded that a blood-alcohol test administered by a nurse was admissible despite allegations that the nurse used an outdated form, where the nurse testified at trial about the procedures which she used to draw and preserve the blood sample and that she had complied with all the provisions of the revised form. We find *Vetsch* distinguishable from the present case because of the nurse's testimony which is lacking in this case.

Subsection 39–20–07(5) lists the statutory requirements for the admissibility of chemical tests as follows:

"The results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and the test was fairly administered, and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist, and by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist."

Subsection 39–20–07(10) augments subsection 39–20–07(5) with the directive that "[a] signed statement from the nurse or medical technician drawing the blood sample for testing as set forth in subsection 5 is prima facie evidence that the blood sample was properly drawn and no further foundation for the admission of such evidence may be required." However, subsection 39–20–07(10) is not applicable in this case because Reil is not disputing that the blood sample was properly drawn. He is saying in effect that there is no evidence indicating that the blood that was drawn was carefully preserved and sent to the

---

**3.** The testimony of the arresting officer concerning the preservation and handling of the blood sample in this case is as follows:

"MR. SCHOPPERT: Alright, Mr. Klipful uh, did you, you did not have a blood test taken in this case, did you?

"THE WITNESS: No, I did not.

"MR. SCHOPPERT: And as far as you know this is Mr. Reil's blood test that was taken, is it not?

"THE WITNESS: That is correct.

"MR. SCHOPPERT: And its true that you were not present when this blood was drawn, were you?

"THE WITNESS: Yes I was.

"MR. SCHOPPERT: Did you preserve this blood prior to mailing?

"THE WITNESS: I did not mail it from the hospital, no.

"MR. SCHOPPERT: I'm going to object. Mr. Klipful, please answer my question would you? Did you mail the blood?

"THE WITNESS: No I did not.

"MR. SCHOPPERT: So you don't know for a fact this is Mr. Reil's blood that was mailed, do you?

"THE WITNESS: No I don't.

"MR. SCHOPPERT: Was this blood to be sent back to you?

"THE WITNESS: No.

"MR. SCHOPPERT: You only wanted one test taken that evening, didn't you?

"THE WITNESS: Yes.

"MR. SCHOPPERT: And that was the breathalyzer test?

"THE WITNESS: That is correct.

"MR. SCHOPPERT: So you have no idea if this blood was properly preserved prior to mailing, do you?

"THE WITNESS: No."

State Toxicologist. We believe that the State did fail in this respect.[4]

The general rule regarding the admissibility of blood-alcohol test results is aptly stated by the United States Court of Appeals for the Fifth Circuit in *Ballou v. Henri Studios, Inc.,* 656 F.2d 1147, 1154–55 (5th Cir.1981), as follows:

"It is firmly established in this Circuit that the question whether the proponent of evidence has proved an adequate chain of custody goes to the weight rather than the admissibility of the evidence, and is thus reserved for the jury. *United States v. Henderson,* 588 F.2d 157, 160 (5th Cir.1979), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979); *United States v. White,* 569 F.2d 263, 266 (5th Cir.1978), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978); *United States v. Ellis,* 547 F.2d 863, 868 (5th Cir.1977). Likewise, the issue of alteration, contamination or adulteration of the evidence is a question for the jury once the proponent of the evidence makes a threshold showing that reasonable precautions were taken against the risk of alteration, contamination or adulteration. *See United States v. Lane,* 591 F.2d 961 (D.C.Cir.1979); *United States v.*

*Alston,* 460 F.2d 48 (5th Cir.1972), *cert. denied,* 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972). The proponent of the evidence 'need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change.... So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in light of the surrounding circumstances.' *Lane,* 591 F.2d at 962–63. Under Fed.R. Evid. 901, once the proponent of the evidence meets the threshold requirement of showing that 'in reasonable probability the article has not been changed in any important respect from its original condition,' *United States v. Albert,* 595 F.2d 283, 290 (5th Cir.1979), *cert. denied,* 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979), any doubts raised concerning the possibility of alteration or contamination of the evidence go to the weight and not the admissibility of the evidence."

To determine whether or not the trial court abused its discretion when it admitted certified copies of Reil's blood-alcohol

---

**4.** Pursuant to our reading of " 'I Only Had Two Beers!' A North Dakota Prosecutor's Manual for DUI Cases" it would appear that a person who fills out the form to be filled in by the specimen collector would have to comply with the directions for sample collection and submission. *See* B. Quick, *I Only Had Two Beers: A North Dakota Prosecutor's Manual for DUI Cases,* 333 (1984, revised 1986) (published by the North Dakota Attorney General's Office). State's exhibit 11 is the certification by the State Toxicologist that forms 104 and 107 attached thereto are true and correct copies of originals on file in his office. The exhibit does not contain the directions for sample collection and submission. Had it contained the directions it would appear that there would have been ample proof of chain of custody. Form 104 could be improved with the inclusion of a provision wherein the specimen collector certifies that he or she followed the directions and placed the properly drawn and sealed container in the regular mailing process. The directions for sample collection and submission for blood specimens read as follows:

"FOR BLOOD OR OTHER FLUID SPECIMENS

"1. Use only a sterile, dry, clean syringe, and needle and a non-alcoholic, non-volatile, skin disinfectant.

"2. Remove stopper from glass vial before filling. These vials do not have a vacuum.

"3. Place 10 ml of whole blood or other liquid specimen into the vial and replace the stopper.

"4. Immediately invert the vial several times to dissolve the chemical and prevent clotting.

"5. Seal the vial with one layer of tape and label the vial with the name of the subject and the arresting officer.

"6. Fill out this form, wrap it around the vial, and place in the mailing container.

"7. Place cotton or tissue paper on top of the vial. Replace the metal screw cap.

"8. Seal mailing container with the long, narrow label by putting it over the cap and attaching it to the cardboard sides.

"9. Affix the return address label around the mailing container over the ends of the seal.

"Forward the sample to the State Toxicologist without delay. If delay is unavoidable refrigerate the urine sample to minimize loss of alcohol & drugs. Use sufficient postage when sent by mail.

"The specimen containers for urine and blood contain sodium azide, and sodium fluoride & potassium oxalate, respectively. These chemicals are poisonous and care should be taken in handling the vial."

test result obtained from the office of the State Toxicologist, we need to examine the record to ascertain whether or not the State made "a threshold showing that reasonable precautions were taken against the risk of alteration, contamination or adulteration."

Reil argues there is no evidence demonstrating that the sample of blood drawn from him was the same sample tested by the State Toxicologist. The State argues that the test result form is in itself sufficient to establish chain of custody.

While it is not necessary for the State to call all persons who have handled the blood sample in order to introduce the test results, it is incumbent upon the State to show that the sample tested is the same one originally drawn from the defendant. *See People v. Sutherland*, 683 P.2d 1192 (Colo.1984); 2 R. Erwin, *Defense of Drunk Driving Cases* § 27.01, at 27–2 (3d Ed. 1987).

Because the State failed to prove that the blood sample tested was the same one drawn from Reil, we believe that the trial court erred in admitting the blood-alcohol test result as evidence and accordingly that the trial court erred when it denied Reil's motion for a new trial.

Notwithstanding that we believe that the issue that we have just decided disposes of this case, lest the other issues raised in Reil's brief should arise in connection with a new trial, we note that we have considered those issues and find them to be without merit. We shall discuss them only briefly.

Reil raises as a second issue that his breath alcohol test results were improperly admitted "because the proper care, custody and control of the Standard Solution was not demonstrated."

In *Pladson v. Hjelle*, 368 N.W.2d 508, 513 (N.D.1985), we concluded:

"We hold that after the Commissioner introduced the certified copies relating to the administration of the test, the fairness and accuracy of the test was prima facie shown. If Pladson wished to discredit the test results with evidence that the standard solution was stale, it was his responsibility to produce such evidence at that time. Because Pladson failed to offer any evidence concerning the need for freshness of the standard solution or how time could affect the solution or its accuracy, Pladson cannot now complain that the test was somehow inaccurately or unfairly administered. The Commissioner complied with the requirements of the statute and Pladson offered no rebutting evidence."

Just as in *Pladson* Reil has failed to offer any rebutting evidence to refute the prima facie showing that his breath test was fair and accurate. Accordingly, we conclude that the trial court did not err in admitting the certified copies of Reil's breath alcohol test results. *See also Berger v. State Highway Commissioner*, 394 N.W.2d 678 (N.D.1986).

The next issue raised by Reil is to the effect that Sections 29–21–01,[5] and 29–

---

5. Section 29–21–01, N.D.C.C., reads as follows:
"*29-21-01. Order of trial.*—The jurors having been impaneled and sworn, the trial must proceed in the following order:
"1. If the information or indictment is for a felony, the clerk or state's attorney must read it, and must state the plea of the defendant to the jury. In all other cases this formality may be dispensed with;
"2. The state's attorney, or other counsel for the state, must open the case and offer the evidence in support of the information or indictment;
"3. The defendant or his counsel then may open his defense and offer his evidence in support thereof;

"4. The parties then, respectively, may offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, or to correct an evident oversight, permits them to offer evidence upon their original case;
"5. When the evidence is concluded, unless the case is submitted to the jury on either side, or on both sides, without argument, the counsel for the state shall commence, and the defendant or his counsel shall follow. Then the counsel for the state shall conclude the argument to the jury;
"6. The judge then must charge the jury."

17–12, N.D.C.C.,[6] were not complied with in that the jurors were not sworn until after "preliminary instructions, and opening instructions [statements] of plaintiff and defendant were given."

Section 29–21–02, N.D.C.C., allows the trial judge leeway to vary the order of trial for cause as follows:

> *"Order of trial may be changed for cause.*—When the state of the pleadings requires it, or in any other case, for good reasons and in the sound discretion of the court, the order of trial and argument prescribed in section 29–21–01 may be departed from."

Inasmuch as no objection was made by Reil on the record to the variation in the usual trial procedure of having the jury sworn at the beginning of the trial prior to opening statements and preliminary instructions, we conclude that this issue is not properly before us. *See State v. Ronngren,* 361 N.W.2d 224 (N.D.1985); *State v. Klose,* 334 N.W.2d 647 (N.D.1983); *State v. Hartsoch,* 329 N.W.2d 367 (N.D. 1983).

For the reasons earlier stated herein the judgment of conviction and the order of the county court denying Reil's motion for a new trial are reversed and this case is remanded for a new trial.

GIERKE, VANDE WALLE and LEVINE, JJ., concur.

MESCHKE, Justice, dissenting.

I dissent.

The majority opinion holds that the certified copy of the results of the blood test from the State Toxicologist's Office was erroneously admitted as evidence because "the State failed to prove that the blood sample tested was the same one drawn from Reil...." But, this ruling does not really explain how it gets around the ex-

plicit directions of subsections (5) and (10) of NDCC § 39–20–07. Subsection (10) says:

> "A signed statement from the nurse or medical technician drawing the blood sample for testing as set forth in subsection 5 is prima facie evidence that the blood sample was properly drawn and no further foundation for the admission of such evidence may be required."

Astonishingly, the majority opinion rejects this evidence without a single reference to our North Dakota Rules of Evidence. This is all the more astonishing when the Federal Rules of Evidence (from which our NDREv are drawn) are identified in the quotation from *Ballou v. Henri Studios, Inc., supra,* which correctly outlined the modern approach to use of blood test results under the Fed.R.Evid. Curiously, *Ballou* held a blood test admissible, which the trial court had excluded "due to concerns regarding possible breaks in the 'chain of custody' ..." 656 F.2d 1154–1155. And, two other decisions cited in the majority opinion sustained the admissibility of blood test results over objections about gaps in the "chain of custody." *Sullivan v. Municipality of Anchorage,* 577 P.2d 1070, 1073 (Alaska 1978) ("We do not believe there is anything to gain by requiring a mechanistic parade of witnesses to ensure that the possibility of error or tampering is precluded beyond any doubt."); *People v. Sutherland,* 683 P.2d 1192, 1197 (Colo.1984) ("We hold that in the absence of any evidence of tampering or lack of authentication, the proponent of evidence relating to the results of a blood-alcohol test and the supporting exhibits is not required to call each witness who may have handled the exhibit.")

The exhibit excluded by the majority opinion contained the signed statement of the nurse who obtained the blood sample

---

**6.** Section 29–17–12, N.D.C.C., reads as follows:
"*29–17–12. Number of jurors—How sworn.* In all felony and class A misdemeanor cases when a jury is impaneled, a jury shall consist of six qualified jurors unless the defendant makes a timely written demand for a jury of twelve. In all other misdemeanor cases when a jury is impaneled, a jury shall consist of six qualified jurors. Jurors shall be sworn or affirmed well and truly to try and true deliverance make between the state of North Dakota and the defendant whom they shall have in charge, and a true verdict to give according to the evidence, and such verdict must be unanimous."

on the top half of a single sheet. The report of the analysis by the State Toxicologist's Office was on the bottom half of the same form. I believe this internal integration sufficiently connects the blood sample with the results of the laboratory analysis, when certified by the State Toxicologist. It is evident that the blood sample got from the nurse to the laboratory. Any other doubts about the authenticity of such a blood sample report should go to the weight and not the admissibility of the evidence. *State v. Vetsch*, 368 N.W.2d 547, 550 (N.D.1985).

NDREv Rule 901(a) says:

"*(a) General Provision.* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

NDREv Rule 901(b) says:

"*(b) Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

" . . . .

"(4) *Distinctive Characteristics and the Like.* Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

" . . . .

"(10) *Methods Provided by Statute or Rule.* Any method of authentication or identification complying with these rules, or other rules adopted by the North Dakota Supreme Court, or as provided by statute."

NDREv Rule 104(b) says:

"*(b) Relevancy Conditioned on Fact.* Whenever the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or in the court's discretion subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

*See also* NDREv Rule 1008.

When we do not pay attention to our current rules of evidence, I fear we perpetuate anachronistic and outmoded attitudes about evidence. Better consideration of the modern approach of our rules of evidence is essential to promote their purposes:

"These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence, to the end that the truth may be ascertained and proceedings justly determined." NDREv Rule 102.

Several excerpts from the work of a current scholar on evidence may help make my point:

"The central point is that whenever proffered evidence is challenged on grounds of authenticity or identity, it should be admitted once a prima facie case has been made on the issue. Such a finding of authenticity does not guarantee that the evidence will be considered by the trier of fact. While it permits admission of the evidence it is—as are all questions of conditional relevance under Rule 104(b)—subject to the jury's ultimate determination as to its genuineness. The opposing party may introduce evidence disputing genuineness and argue the point to the jury. Once the evidence is admitted the question becomes one of credibility and probative force and the trier may ultimately disbelieve the proponent's proof and entirely disregard or substantially discount the persuasive impact of the evidence admitted. The rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification. The rest is up to the jury." J. Weinstein & M. Berger, 5 Weinstein's Evidence ¶ 901(a)[01], at 901–16 to 18 (1983).

"The draftsmen opted to treat authentication and identification as specialized rules of relevance. As a result, the preliminary condition of fact is one for the trier of fact and the standard of admissibility is identical to that required under Rule 104(b) relating to matters of condi-

tional relevance generally—would a finding of fulfillment of the condition be supported by the evidence? This approach reflects the Rules' generally liberal preference for admission of evidence and comports with the conclusions of earlier codifiers.

"This rule does not ignore or repudiate the policy justifications for the authentication requirement. It simply recognizes that where the question is one of probative force or credibility—as it necessarily always is with questions of authenticity and identity—the jury is as competent as the court. The jury is constituted expressly for the purpose of applying common sense and community mores to disputed issues of fact where the principal question is almost always one of credibility. In Rules 104(b), 602, 901(a) and the second sentence of Rule 1008 the court is told to admit where a reasonable juror might find for the proponent on the issue of relevancy. In deciding whether to admit, issues of credibility are decided in favor of the proponent. See discussion in ¶ 1008(a)[02]." *Id.*, ¶ 901(a)[02] at 901–21 to 22.

"Wigmore's conclusion that mere contents will not suffice to authenticate unless only the author would have known the details is contrary to the federal rules and unsound. Even if other persons would have known the details of the writing, it can be shown that under the circumstances it was unlikely that they would have written the letter. Proof of these circumstances and the contents of the writing can then sufficiently authenticate the document. The common law prejudice against self-authenticating documents is not carried over into the Federal Rules." *Id.* ¶ 901(b)(4)[01] at 901–50 to 51.