STATE of North Dakota, Plaintiff
and Appellee,

v.

Gregory Allen SCHWALK, Defendant
and Appellant.

Cr. No. 870275.

Supreme Court of North Dakota.

Oct. 18, 1988.

Melody R.J. Jensen, Asst. States Atty., Fargo, and Steven Dawson, Sr. Law Student, for plaintiff and appellee. Argued by Steven Dawson, under the supervision of Melody R.J. Jensen.

Weiss, Wright & Paulson, Jamestown, for defendant and appellant; argued by Thomas Merrick. Appearance by James A. Wright.

LEVINE, Justice.

Gregory Allen Schwalk appeals from a judgment of conviction finding him guilty of being in actual physical control of a vehicle while having a blood alcohol concentration of at least .10 percent, in violation of Section 39-08-01(1)(a), N.D.C.C. We reverse and remand for a new trial.

On March 28, 1987, at approximately 2:30 a.m., a Fargo police officer found Schwalk slumped over the steering wheel of his pickup, which was parked on the side of the road with the engine running and the head-lights on. After unsuccessfully attempting to wake Schwalk by tapping on the window, the officer opened the door and shook Schwalk until he awoke. The officer conducted field sobriety tests and arrested Schwalk. Schwalk was transported to a local hospital where a nurse drew a blood sample. The arresting officer mailed the sample to the State Toxicologist for testing.

Schwalk was convicted of being in actual physical control of a vehicle while having a blood alcohol content of at least .10 percent. The court rejected his contentions that the actual physical control statute does not apply to a sleeping or unconscious person and that the statute is void for vagueness. The trial court admitted the results of the blood test over Schwalk's objection that the State had failed to lay an adequate foundation for its admission.

Schwalk raises the following issues on appeal:

I. May a person who is asleep or unconscious be convicted of being in "actual physical control" of a vehicle?

II. Is the actual physical control statute, Section 39-08-01(1), N.D.C.C., unconstitutionally vague?

III. Did the trial court err in admitting the blood test results?

I.

Section 39-08-01(1)(a) & (b), N.D.C.C., provides:

"*39-08-01. Persons under the influence of intoxicating liquor or any other drugs or substances not to operate vehicle—Penalty.*

"1. A person may not drive or be in actual physical control of any vehicle upon a highway or upon public or private areas to which the public has a right of access for vehicular use in this state if any of the following apply:

"a. That person has a blood alcohol concentration of at least ten one-hundredths of one percent by weight at the time of the performance of a chem-

ical test within two hours after the driving.

"b. That person is under the influence of intoxicating liquor."

■ Schwalk asserts that the statute does not apply to a person who is behind the wheel of a vehicle but is asleep or unconscious.

We recently rejected a similar argument in *Buck v. North Dakota State Highway Commissioner*, 425 N.W.2d 370 (N.D. 1988). Our opinion in *Buck* clearly points out that one may be in "actual physical control" of a vehicle under the statute even though he is asleep or unconscious when found by the officer:

" 'The purpose of the "actual physical control" offense is a preventive measure.' *State v. Schuler*, 243 N.W.2d 367, 370 (N.D.1976). '[A]n intoxicated person seated behind the steering wheel of a motor vehicle is a threat to the safety and welfare of the public.' *Id.*, 243 N.W. 2d at 370, quoting *Hughes v. State*, 535 P.2d 1023, 1024 (Okl.Crim.App.1975). An intoxicated person in a motor vehicle poses a threat to public safety because he 'might set out on an inebriated journey at any moment.' *Martin v. Commissioner of Public Safety*, 358 N.W.2d 734, 737 (Minn.App.1984).

"That Buck may neither have driven his vehicle while intoxicated, nor have intended to drive while still intoxicated, does not vitiate Officer Scherbenske's reasonable grounds to believe that Buck was in actual physical control of a vehicle in violation of § 39–08–01, N.D.C.C. '[T]he real purpose of the statute is to deter individuals who have been drinking intoxicating liquor from getting into their vehicles, except as passengers.' *State v. Ghylin*, 250 N.W.2d 252, 255 (N.D.1977). An intoxicated individual who gets into his vehicle to sleep poses a threat of immediate operation of the vehicle at any time while still intoxicated." *Buck v. North Dakota State Highway Commissioner, supra*, 425 N.W.2d at 372–373.

We conclude that the actual physical control statute may be applied to Schwalk under the circumstances presented here. In accordance with *Buck*, it was appropriate for the trial court to find that Schwalk was in actual physical control of his vehicle while having a blood alcohol concentration in excess of the legal limit.

II.

Schwalk asserts that the actual physical control statute is unconstitutionally vague because an ordinary person would not understand what conduct is proscribed.

■ The due process clauses of the federal and state constitutions require definiteness of criminal statutes so that the language, when measured by common understanding and practice, gives adequate warning of the conduct proscribed and marks boundaries sufficiently distinct for judges and juries to fairly administer the law. *State v. Johnson*, 417 N.W.2d 365, 368 (N.D.1987). In order to survive a vagueness challenge, a statute must meet two requirements: (1) it must provide adequate warning as to the conduct proscribed, and (2) it must establish minimum guidelines to govern law enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903, 909 (1983); *State v. Johnson, supra*, 417 N.W. 2d at 368.

Schwalk has not cited any case which has held that the phrase "actual physical control" fails to apprise an ordinary person of the conduct proscribed by the statute. Our research, however, reveals a line of cases from other jurisdictions consistently rejecting vagueness challenges to actual physical control statutes. *See, e.g., City of Kansas City v. Troutner*, 544 S.W.2d 295, 299–300 (Mo.Ct.App.1976); *State v. Ruona*, 133 Mont. 243, 321 P.2d 615, 618–619 (1958); *Parker v. State*, 424 P.2d 997, 999–1000 (Okla.Crim.App.1967); *State v. Trucott*, 145 Vt. 274, 487 A.2d 149, 152–153 (1984); *Adams v. State*, 697 P.2d 622, 624 (Wyo. 1985).

■ We agree with the reasoning in these cases that the phrase "actual physical control" provides adequate notice of the conduct proscribed and provides the requi-

site guidance to law enforcement. In particular, we note that prior judicial interpretations of our actual physical control statute, Section 39–08–01(1), N.D.C.C., provided sufficient notice that the type of conduct engaged in here was proscribed by the statute. In this respect we note that judicial interpretations clarifying vague or ambiguous language may be taken into consideration in determining whether the public has been put on notice of the conduct proscribed. *See, e.g., Rose v. Locke,* 423 U.S. 48, 49–50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975); *Parker v. Levy,* 417 U.S. 733, 752–756, 94 S.Ct. 2547, 2560–2561, 41 L.Ed. 2d 439 (1974). As noted in *Rose v. Locke, supra:*

> "It is settled that the fair-warning requirement embodied in the Due Process Clause prohibits the States from holding an individual 'criminally responsible for conduct which he could not reasonably understand to be proscribed.' *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954); see *Wainwright v. Stone,* 414 U.S. 21, 22, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973). But this prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.' *Robinson v. United States,* 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944 (1945). Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. Cf. *Nash v. United States,* 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); *United States v. National Dairy [Products] Corp.,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden."

We believe that Section 39–08–01(1), N.D. C.C., when viewed in light of prior judicial interpretations, provided adequate warning that Schwalk's conduct was proscribed. As noted in *Buck v. North Dakota State Highway Commissioner, supra,* we have long construed Section 39–08–01(1), N.D. C.C., to broadly prohibit any exercise of dominion or control over a vehicle by an intoxicated person. For example, in *State v. Schuler,* 243 N.W.2d 367 (N.D.1976), we upheld a conviction of a defendant who was seated behind the wheel of her vehicle, which was partially in the ditch and "high-centered," apparently unable to move. We cited with approval *Hughes v. State,* 535 P.2d 1023 (Okla.Crim.App.1975), specifically noting that *Hughes* upheld a conviction for actual physical control where the defendant was found slumped and unconscious in the driver's seat. *State v. Schuler, supra,* 243 N.W.2d at 370. We quoted with approval the following language from *Hughes:*

> " 'It is our opinion that the legislature, in making it a crime to be in "actual physical control of a motor vehicle while under the influence of intoxicating liquor," intended to enable the drunken driver to be apprehended before he strikes.

> \* \* \* \* \* \*

> " 'We believe that an intoxicated person seated behind the steering wheel of a motor vehicle is a threat to the safety and welfare of the public. The danger is less than where an intoxicated person is actually driving a vehicle, but it does exist.' " *State v. Schuler, supra,* 243 N.W.2d at 370 (*quoting Hughes v. State, supra,* 535 P.2d at 1024).

In *State v. Ghylin,* 250 N.W.2d 252, 255 (N.D.1977), we again quoted much of the above language from *Hughes v. State, supra,* and continued the quote:

> " 'The defendant when arrested may have been exercising no conscious violation with regard to the vehicle, still there is a legitimate inference to be drawn that he placed himself behind the wheel of the vehicle and could have at any time started the automobile and driven away. He therefore had "actual physical control" of the vehicle within the meaning of the

statute.' " *State v. Ghylin, supra,* 250 N.W.2d at 255, (*quoting Hughes v. State, supra,* 535 P.2d at 1024).

We also stated in *State v. Ghylin* that the definition of "actual physical control" does not rest on exacting factual distinctions:

> "The definition of 'actual physical control' does not rest on such fine distinctions. The court, in *Commonwealth v. Kloch,* 230 Pa.Super. 563, 327 A.2d 375, 383 (1975), defined the phrase in these terms:
>
>> " 'A driver has "actual physical control" of his car when he has real (not hypothetical), bodily restraining or directing influence over, or domination and regulation of, its movements of machinery. * * *
>>
>> " 'It is not dispositive that appellant's car was not moving, and that appellant was not making an effort to move it, when the troopers arrived. A driver may be in "actual physical control" of his car and therefore "operating" it while it is parked or merely standing still "so long as [the driver is] keeping the car in restraint or in position to regulate its movements.' " *State v. Ghylin, supra,* 250 N.W.2d at 254.

We went on to conclude in *Ghylin* that the purpose of the actual physical control statute is to deter intoxicated individuals from getting into their vehicles, except as passengers.

We conclude that Section 39–08–01(1), N.D.C.C., when read in light of interpretive judicial decisions, provided adequate notice to Schwalk that his conduct was proscribed by the statute and provided sufficient guidance for law enforcement. Accordingly, the statute is not unconstitutionally vague as applied to Schwalk.[1]

### III.

Schwalk asserts that the trial court erred in admitting the results of the blood alcohol test. Subsections (5), (8), and (10) of Section 39–20–07, N.D.C.C., govern the admissibility of blood sample test results:

> "*Interpretation of chemical tests.* Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor, drugs, or a combination thereof, evidence of the amount of alcohol, drugs, or a combination thereof in the person's blood at the time of the act alleged as shown by a chemical analysis of the blood, breath, saliva, or urine is admissible. For the purpose of this section:
>
> \*     \*     \*     \*     \*     \*
>
> "5. The results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and the test was fairly administered, and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist, and by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist. The state toxicologist is authorized to approve satisfactory devices and methods of chemical analysis and determine the qualifications of individuals to conduct such analysis, and shall issue a certificate to all qualified operators who exhibit the certificate upon demand of the person requested to take the chemical test.
>
> \*     \*     \*     \*     \*     \*
>
> "8. A certified copy of the analytical report of a blood, urine, or saliva

---

1. Schwalk has raised various hypothetical situations which he asserts demonstrate the vagueness and ambiguity of the statute. Other than in a First Amendment context, however, a defendant must demonstrate that the statute in question is vague as applied to his own conduct, without regard to its potentially vague application in other circumstances. *State v. Tibor,* 373 N.W.2d 877, 880 (N.D.1985). Because Schwalk's conduct was clearly prohibited by the statute, he cannot complain of its possible application to the conduct of others. *State v. Johnson,* 379 N.W.2d 291, 293 (N.D.), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 337 (1986).

analysis issued by the office of the state toxicologist must be accepted as prima facie evidence of the results of a chemical analysis performed under this chapter.

\* \* \* \* \* \*

"10. A signed statement from the nurse or medical technician drawing the blood sample for testing as set forth in subsection 5 is prima facie evidence that the blood sample was properly drawn and no further foundation for the admission of such evidence may be required."

■ The purpose of Section 39–20–07 is "to ease the requirements for admissibility of chemical test results while ensuring that the test upon which the results are based is fairly administered. The legislature has struck a balance between procedural efficiency and substantive reliability." *Salter v. Hjelle*, 415 N.W.2d 801, 803 (N.D.1987). In interpreting the statute we must construe subsections (5), (8), and (10) together to give effect to the entire statute. *Salter v. Hjelle, supra*, 415 N.W.2d at 804. Thus, a certified copy of blood test results is admissible pursuant to subsections (8) and (10) only if fair administration of the test has been established in accordance with subsection (5). *See, State v. Reil*, 409 N.W.2d 99, 102 (N.D.1987).

In light of this statutory scheme, the State Toxicologist has drafted Form 104 to be used when a blood sample is drawn for blood alcohol testing. The back side of Form 104 contains the directions for collection and submission of blood samples, including a nine-step process:

" 'FOR BLOOD OR OTHER FLUID SPECIMENS

" '1. Use only a sterile, dry, clean syringe, and needle and a non-alcoholic, non-volatile, skin disinfectant.

" '2. Remove stopper from glass vial before filling. These vials do not have a vacuum.

" '3. Place 10 ml of whole blood or other liquid specimen into the vial and replace the stopper.

" '4. Immediately invert the vial several times to dissolve the chemical and prevent clotting.

" '5. Seal the vial with one layer of tape and label the vial with the name of the subject and the arresting officer.

" '6. Fill out this form, wrap it around the vial, and place in the mailing container.

" '7. Place cotton or tissue paper on top of the vial. Replace the metal screw cap.

" '8. Seal mailing container with the long, narrow label by putting it over the cap and attaching it to the cardboard sides.

" '9. Affix the return address label around the mailing container over the ends of the seal.

" 'Forward the sample to the State Toxicologist without delay. If delay is unavoidable refrigerate the urine sample to minimize loss of alcohol & drugs. Use sufficient postage when sent by mail.

" 'The specimen containers for urine and blood contain sodium azide, and sodium fluoride & potassium oxalate, respectively. These chemicals are poisonous and care should be taken in handling the vial.' " *State v. Reil, supra*, 409 N.W.2d at 103 n. 4.

The directions for sample collection and submission on Form 104 essentially comprise two components: the actual procedure for collecting and preserving the blood sample and the directions for submitting the sample to the State Toxicologist. The first component ensures that the scientific accuracy and reliability of the test are not affected by improper collection or preservation of the blood sample. The second component in effect provides an evidentiary shortcut for establishing chain of custody. In a trio of recent cases we have held blood alcohol test results inadmissible where the State failed to prove chain of custody either through compliance with the directions on Form 104 or through other evidence. *State v. Nygaard*, 426 N.W.2d 547 (N.D. 1988); *State v. Wright*, 426 N.W.2d 3 (N.D. 1988); *State v. Reil, supra*. There is, however, no chain of custody issue raised in

this case. Schwalk's assertions go to the sample collection/scientific accuracy component.

The front of Form 104 contains a section to be filled in by the nurse or medical technician who draws the blood. The nurse is to certify that the container was intact before use, that a sterile, dry, clean syringe and needle were used, that non-alcoholic, non-volatile skin disinfectant was used, and that the specimen was drawn from the named individual. This statement essentially covers only the first step of the nine-step process.

■ Nowhere on Form 104 is there any signed statement or certification, either by the nurse or the officer, that the remaining eight steps have been complied with. We noted this deficiency in *State v. Reil, supra*, 409 N.W.2d at 103 n. 4, stating that "Form 104 could be improved with the inclusion of a provision wherein the specimen collector certifies that he or she followed the directions and placed the properly drawn and sealed container in the regular mailing process." Absent such a written certification that all of the State Toxicologist's directives for sample collection have been followed, Form 104 does not on its face establish fair administration of the test, and the State must therefore do so by other evidence.

The State attempted to meet its burden in this case by introducing testimony of the arresting officer regarding the collection of the sample and compliance with the State Toxicologist's directives. The officer's testimony, however, does not establish compliance with all nine steps. Schwalk specifically points to the lack of any evidence of compliance with step four, which requires that immediately upon placing the blood in the glass vial it must be inverted several times to dissolve the chemicals contained in the vial. Failure to invert the vial calls into question the scientific accuracy of the blood alcohol test results.

Because Schwalk's assertion raises questions regarding the scientific accuracy of the specimen collection, our holding in *Moser v. North Dakota State Highway Commissioner*, 369 N.W.2d 650 (N.D.1985), is controlling. *Moser* involved a challenge to admissibility of Breathalyzer test results where the operator had failed to accurately follow all steps for conducting the test as set out in the approved method promulgated by the State Toxicologist. In holding that deviation from the approved method rendered the test results inadmissible, we stated:

"The foundational requirements needed to show that a Breathalyzer test was 'fairly administered' so as to render the results admissible, may be met either through testimony of the state toxicologist or through the introduction of certified copies of approved methods and techniques filed by the state toxicologist with the clerk of the district court pursuant to NDCC § 39–20–07. *State v. Schneider, supra* [270 N.W.2d 787 (N.D. 1978)]. Absent testimony by the state toxicologist, the foundational requirement necessary to show fair administration of a breathalyzer test and admissibility of the test results is a showing that the test was administered in accordance with the approved methods filed with the clerk of the district court. Thus, reliability and accuracy of the results are established by demonstrating compliance with the methods adopted by the state toxicologist. Because the statute permits admission of such evidence without expert witness testimony to establish accuracy and reliability, all the requirements of the statute must be scrupulously met to ensure a uniform basis of testing throughout the State and fair administration." *Moser v. North Dakota State Highway Commissioner, supra,* 369 N.W.2d at 653–654.

■ The import of our decision in *Moser* is that when the State Toxicologist has established methods and procedures for conducting the requisite test, fair administration can be established only by proof that those methods were "scrupulously" complied with or by expert testimony. While we recognize that the approved method for the Breathalyzer at issue in *Moser* was formally adopted and filed with the district court, we find no reason to

accord any less deference to the directions for blood sample collection set out on Form 104. Those directions are part of an official document drafted by the State Toxicologist and are included in every blood sample kit used to collect blood samples for alcohol testing in the state. We assume that the State Toxicologist has reasons for establishing directions for blood sample collection and submission, *State v. Nygaard, supra,* 426 N.W.2d at 549, and those reasons must be to ensure the scientific accuracy and reliability of the test results. Thus, we conclude that if the State fails to establish compliance with those directions for sample collection which go to the scientific accuracy and reliability of the test, the State must prove fair administration of the test through expert testimony. *Moser v. North Dakota State Highway Commissioner, supra,* 369 N.W.2d at 653.

■ The State in this case did not prove that step four on Form 104 had been completed. The State could have attempted to cure the foundational defect through testimony of the State Toxicologist explaining the effect of failure to invert the vial and mix the chemicals with the blood. *Moser v. North Dakota State Highway Commissioner, supra,* 369 N.W.2d at 654; *State v. Guthmiller,* 350 N.W.2d 600, 602 (N.D. 1984). In the absence of such testimony, however, we will not speculate on the possible effect failure to invert the vial might have had on the ultimate test results. We note, however, that at least one author suggests that immediate inversion of the vial and mixing the blood with the chemicals therein is necessary to "retard the generation of alcohol in a blood specimen." B. Quick, *I Only Had Two Beers: A North Dakota Prosecutor's Manual for DUI Cases* 58 (1984, revised 1986) (published by the North Dakota Attorney General's Office).

The State contends that the officer's testimony in this case was sufficient to establish fair administration of the test, relying upon *State v. Hanson,* 345 N.W.2d 845 (N.D.1984). In *State v. Hanson, supra,* we stated that the officer's testimony regarding the conditions of obtaining the blood sample and his subsequent handling and mailing of the sample was sufficient to establish chain of custody and fair administration of the test. We believe, however, that *Hanson* is distinguishable from the case at bar. There was no indication in *Hanson* that the State Toxicologist had established methods and procedures for collection and submission of blood samples. A notation on Form 104 appears to indicate that the form was issued in November 1984, after *Hanson* had been decided. Thus, we were not presented with a situation where the State failed to prove compliance with an approved method. The State Toxicologist's development of methods and procedures for blood sample collection, and our intervening decision in *Moser,* require that fair administration of the test may now be established only through proof that the Form 104 methods for collection and preservation of the blood sample were scrupulously complied with or through expert testimony establishing the scientific accuracy of the test. The State has failed to prove fair administration of the test in this case.

The State argues that it can be presumed that the nurse or the officer inverted the vial as required by step four on Form 104. We rejected such an argument in *Salter v. Hjelle, supra,* 415 N.W.2d at 804–805, noting that to apply such a presumption "would effectively eliminate the requirement of § 39–20–07(5) that the [State] prove fair administration."

We conclude that the trial court erred in admitting the results of Schwalk's blood alcohol test. Because Schwalk was convicted of violating Section 39–08–01(1)(a), N.D.C.C. (actual physical control while having a blood alcohol content of at least .10 percent), and the test results were the only evidence presented demonstrating a blood alcohol content of .10 percent or greater, Schwalk's conviction must be reversed.

■ The judgment of conviction is reversed and we remand to the county court

for a new trial.[2]

ERICKSTAD, C.J., and VANDE WALLE and GIERKE, JJ., concur.

MESCHKE, Justice, concurring and dissenting.

I concur that the "actual physical control" statute applied to Schwalk and that it was constitutional. I respectfully dissent from the holding that the trial court erred in admitting the results of Schwalk's blood test.

Without evidence, the majority opinion conjectures that "[f]ailure to invert the vial calls into question the scientific accuracy of the blood alcohol test results." This speculation proceeds from an assumption that the State Toxicologist's reason for each one of his directions "must be to ensure the scientific accuracy and reliability of the test results." I am unwilling to so conclude without evidence.

In fact, we do not know whether a step to "prevent clotting" of the sample relates to scientific reliability or to some other reason, for example, laboratory convenience for assaying the sample. For all we know, the State Toxicologist required certification of all essential steps for the scientific reliability of the blood test. The fact that he suggested additional steps, other than those certified by the "nurse or medical technician," does not make those added steps indispensable. It is for the State Toxicologist, not this court, to decide what determines whether the sample was properly drawn and what affects its scientific reliability.

The majority opinion correctly observes that the State "did not *prove* that step four ... had been completed." (Emphasis added). But, in my view, there is no evidentiary rule or statutory dictate that the State

2. Schwalk has asked this court to reverse his conviction outright, apparently upon grounds of double jeopardy, although he provides no authorities or supportive reasoning for such a result. It is a "venerable principle" of double jeopardy jurisprudence that a successful appeal of a judgment of conviction, on any ground other than insufficiency of the evidence to support the verdict, poses no bar to further prosecution on the same charge. *E.g., Montana v. Hall*, 481 U.S. 400, 405, 107 S.Ct. 1825, 1826, 95 L.Ed.2d 354 (1987); *United States v. Scott*, 437 U.S. 82, 90–91, 98 S.Ct. 2187, 2193–2194, 57 L.Ed.2d 65 (1978).

Our resolution of this case does not, for purposes of double jeopardy, constitute a determination that the evidence was insufficient to support the verdict. Numerous federal cases indicate that a reversal for a procedural trial error such as erroneous admission of evidence does not bar further prosecution of the defendant, even where, as here, the erroneously admitted evidence was the only evidence presented on a necessary element of the offense. *See, e.g., United States v. Gonzalez–Sanchez*, 825 F.2d 572, 588–589 n. 57 (1st Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *United States v. Marshall*, 762 F.2d 419, 423 (5th Cir.1985); *United States v. Key*, 725 F.2d 1123, 1127 (7th Cir.1984); *United States v. Harmon*, 632 F.2d 812, 814 (9th Cir.1980). The basis for the rule is explained in *United States v. Harmon, supra*, 632 F.2d at 814:
   "Reversal for evidentiary insufficiency constitutes a decision that the government failed to prove the guilt of the accused. Reversal for failure to suppress evidence involves only a

determination that the trial process was defective in a material respect, and implies nothing as to the sufficiency of the evidence of guilt of the defendant. The untainted evidence introduced by the government does not necessarily reflect all other available evidence of the defendant's involvement. It is impossible to know what additional evidence the government might have produced had the faulty evidence been excluded at trial, or what theory the government might have pursued had the evidence before the jury been different. *United States v. Mandel*, 591 F.2d 1347, 1373–74 (4th Cir.), *rev'd on other grounds*, 602 F.2d 653 (4th Cir.1979) (*en banc* ); *United States v. Block*, 590 F.2d 535, 544 n. 12 (4th Cir.1978). It would prolong trials unduly to adopt a rule that would require the government to introduce all available evidence and assert every possible legal theory in anticipation of reversal of trial court rulings admitting evidence. Moreover,
   "it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest.
   *"United States v. Tateo*, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964). *See also United States v. Houltin*, 566 F.2d 1027, 1033 (5th Cir.1978)."
The erroneous admission of the blood test results in this case was a procedural error, and double jeopardy does not bar a retrial.

must do so. Only assumption and conjecture suggest such a need.

I agree that the various subsections of NDCC 39–20–07 should be construed together to give effect to the entire statute. I do not agree that the phrase, "properly obtained," in subsection 5 should have this court's notions about "scientific reliability" amended to it. Nor do I think that judicial amendment should override the legislated presumption in subsection 10 that a blood sample was "properly drawn."

This report contained the statement signed by the nurse as prescribed by the State Toxicologist:

> "I state under the penalties of perjury that I withdrew the blood specimen from the above subject and the information given in this section is true and correct."

The legislature has directed that this is "prima facie evidence that the blood sample was properly drawn." The legislature has also declared "no further foundation for the admission of [the report] may be required." NDCC 39–20–07(10). No published rule of evidence says otherwise. By adding essential requirements to those stipulated by the State Toxicologist, the majority opinion thwarts an important legislative policy.

There is no gross unfairness to a driver in admitting the test report in a case like this. If, in fact, the assumed foundational detail not proven by the State seriously affects the "scientific reliability" of the test, the driver may show that. Indeed, the legislature has given each driver cost-free access to the persons involved in each test, thus fairly balancing the usual cost-savings to the public through the abbreviation of routine scientific testimony about every test. Subsection 9 of NDCC 39–20–07 says:

> "Notwithstanding any statute or rule to the contrary, the defendant in any criminal proceeding may subpoena, without cost to the defendant, the person who conducted the chemical analysis referred to in this section to testify at the trial on the issue of the amount of alcohol, drugs, or a combination thereof in the defend-

ant's blood, breath, saliva, or urine at the time of the alleged act."

Where there was probable cause to believe the driver was drunk, the legislature has sought thus to shift the burden of going forward with evidence to the driver to show error in the test. The majority opinion does not credit this purpose. This adds to the social cost of controlling drunk drivers on our highways.

I agree that a trial court may properly refuse to allow evidence of a test report not "properly obtained and fairly administered." But only evidence can show that, not the lack of evidence. Only real, not imaginary, defects in a blood test should prevent its use as evidence. *See State v. Vetsch*, 368 N.W.2d 547, 549 (N.D.1985). Therefore, I do not agree that admission of a report with a possible, but unconfirmed, defect was reversible error.

We should review the evidentiary admission of a test report under our North Dakota Rules of Evidence which "vest[ ] wide discretion in the trial court to control the introduction of evidence." Explanatory Notes to Rules 403 and 401, NDREv. Generally, lack of proof about compliance with one particular procedure should reflect only on the weight of a test report, not its admission. Only if the variance is confirmed to be critical to its evidentiary worth, to the satisfaction of the trial judge, should the test report be excluded. *See* my dissents in *Moser v. North Dakota State Highway Commissioner*, 369 N.W.2d 650 (N.D.1985); *Schirado v. North Dakota State Highway Commissioner*, 382 N.W.2d 391 (N.D.1986); *State v. Reil*, 409 N.W.2d 99 (N.D.1987); and *State v. Nygaard*, 426 N.W.2d 547 (N.D.1988). We should not adhere to technical evidentiary notions which have been bypassed by experience and by rule, as well as by legislation.

In this case, we do not know whether, in fact, there was a failure to follow step 4 of the directions. Nor do we know how it may have affected the test result, if at all. This driver chose not to submit any evidence about the scientific reliability of the test report if step 4 of the directions was

omitted. He did not even establish that the step was omitted.

Because this driver was not foreclosed from showing scientific unreliability of the test report (if that was the case), and because I believe that the trial court did not abuse its discretion in admitting the report, I would affirm on all points. However, at the retrial, the State is certainly free to offer evidence that step 4 of the test was carried out, or, if it was not, that its omission did not seriously reduce the reliability of the results.