**Kenneth KUMMER, Petitioner and Appellant,**

v.

**Richard BACKES, Director, North Dakota Department of Transportation, Respondent and Appellee.**

**Civ. No. 920026.**

Supreme Court of North Dakota.

June 25, 1992.

---

Schoppert Law Firm, Minot, for petitioner and appellant; argued by Thomas K. Schoppert.

Gregory B. Gullickson (argued), Asst. Atty. Gen., Bismarck, for respondent and appellee.

JOHNSON, Justice.

Kenneth Kummer appeals from a district court judgment which affirmed the administrative hearing officer's decision to suspend Kummer's driving privileges for 91 days. We affirm.

On September 14, 1991, North Dakota Highway Patrol Trooper Norman Ruud was completing a stop of another vehicle when he noticed a Ford van traveling in an easterly direction. Ruud followed the van, which was being driven by Kummer, for approximately one and one-half miles. While following the van, Ruud noticed it cross the white road edge line "a couple of times." Prior to the stop, he noticed the van cross the white line and go off the roadway onto the grass and then back up on the roadway. Ruud activated his lights and stopped the van.

When Ruud approached the van he noticed the odor of alcohol. After checking Kummer's license and vehicle registration, Ruud directed Kummer to his patrol car where the odor of alcohol became more noticeable. Ruud asked Kummer if he had been drinking and Kummer replied that he had. Ruud administered the horizontal gaze nystagmus test, which Kummer failed. Kummer indicated to Ruud that he had a bad leg; therefore, he could not fairly perform the other physical field sobriety tests. After some discussion, Kummer completed and failed an Alco–Sensor breathalyzer test. Ruud then placed Kummer under arrest for driving while under the influence. Kummer consented to a blood test and was transported to the McKenzie County Hospital. While at the hospital, a medical technician drew a blood sample from Kummer. Ruud then took the sample and mailed it to the State Toxicologist lab the next day.

The test result indicated that Kummer had a blood-alcohol concentration level of at least .10 percent alcohol by weight, and notice was given to Kummer of the Director's intent to revoke his driver's license. Kummer requested an administrative hearing pursuant to section 39–20–05, N.D.C.C. A hearing was held on October 16, 1991, at the McKenzie County courthouse in Watford City. Trooper Ruud testified to the events which led to the arrest of Kummer and the subsequent testing of Kummer's blood.

The medical technician initialed the portion of the sample collection checklist which indicated that a nonalcoholic, nonvolatile skin disinfectant was used. The technician signed and dated Form 104, stating that povidone iodine was used as a skin disinfectant. At the hearing, no testimony or other evidence contradicted this information. This form and the blood test results were received into evidence at the hearing.[1]

---

1. Section 39–20–05(4), N.D.C.C., reads:

At a hearing under this section, the regularly kept records of the commissioner may be introduced. Those records establish prima facie their contents without further foundation. For purposes of this chapter, any copy of a certified copy of an analytical report of a blood, urine, or saliva sample received by the commissioner from the office of the state toxicologist or a law enforcement officer, a certified copy of the checklist and test records received by the commissioner from a certified breath test operator, and any copy of a certified copy of a certificate of the office of the state toxicologist relating to approved methods, devices, operators, materials, and check-

License suspension hearings are reviewed by this Court according to the Administrative Agencies Practice Act, (Chapter 28–32, N.D.C.C.). Our review is confined to the record before the agency. *Keepseagle v. Backes,* 454 N.W.2d 312, 314 (N.D.1990). We do not review the decision of the district court. *Id.* As we have stated previously, our review requires a three-step process: (1) Are the agency's findings of fact supported by a preponderance of evidence? (2) Are the conclusions of law sustained by the agencies findings of fact? (3) Is the agency's decision supported by the conclusions of law? *Bryl v. Backes,* 477 N.W.2d 809, 811 (N.D.1991); *Keepseagle v. Backes,* 454 N.W.2d 312, 314 (N.D.1990); *Schwind v. Director, Department of Transportation,* 462 N.W.2d 147, 149 (N.D.1990).

The decision of the hearing officer indicates that he found "[a] nonalcoholic, non-volatile skin disinfectant was used named povidone iodine, which is approved by the office of the state toxicologist." The hearing officer concluded that Ruud had articulable and reasonable grounds to stop Kummer; he was arrested and had a blood-alcohol content of at least .10 percent by weight. The Director had jurisdiction because the officer forwarded a certified written report in the form required within five days of issuing a temporary operator's permit. Section 39–20–03.1(3), N.D.C.C. The hearing officer suspended Kummer's driving privileges for 91 days.

On appeal, Kummer asserts that the blood test result should have been excluded from evidence because an unacceptable disinfectant was used by the medical technician who drew the blood. Kummer claims that the State Toxicologist issued a memorandum to nurses and technicians which requires the use of Acu-dyne as a disinfectant for drawing blood, and precludes use of any other disinfectants. The memorandum indicates that a list of other acceptable disinfectants would be forthcoming; however, no list has yet been filed with the North Dakota Department of Transportation Director. Kummer argues that the memorandum and attached package label issued by the State Toxicologist in February of 1991 replaces the prior 1988 memorandum,[2] and controls this case. The Acu-dyne package label states, in pertinent part:

Enclosed is a package of Acu-dyne prep swabs. They are non-alcoholic, non-volatile skin disinfectants to be used only in conjunction with the blood collection kits provided by the Office of the State Toxicologist.

When one of these prep swabs is used, the specimen collector should check the appropriate box and write "Acu-dyne from State Tox. Lab" or a similar notation in the blank space following "non-alcoholic, non-volatile skin disinfectant" on Form 104 to indicate that the swab provided by this office was used.

The Director argues that the use of Acu-dyne is not exclusive and that other non-volatile, nonalcoholic disinfectants can still be used in connection with the blood testing kits issued by the State Toxicologist. The Director claims that the February 1991 memorandum does not rescind or replace the prior 1988 memorandum. The failure of the State Toxicologist to issue a list of solutions did not exclude the use of other nonalcoholic solutions.

lists used for testing for blood alcohol concentration received by the commissioner from the office of the state toxicologist or the clerk of district court, are regularly kept records of the commissioner.

2. In July of 1988, the State Toxicologist issued a memorandum to emergency room supervisors which indicated the appropriate solutions to be used when drawing blood samples from persons suspected of driving while under the influence of alcohol or drugs. This memorandum stated:

Aqueous solutions of chlorhexidine, povidone iodine, quaternary ammonium compounds, germicidal soaps, etc. are quite satisfactory for this purpose and fit the description of 'non alcoholic, non volatile skin disinfectant'. In fact, any disinfectant or antiseptic solution marketed for this purpose that does not contain low boiling alcohols like ethyl, methyl, propyl, isopropyl, etc. and volatile organic compounds like ether, chloroform, benzene, acetone, etc. is suitable. These disinfecting agents are not considered volatile for this purpose.

Kummer argues that this Court requires that the directions of the State Toxicologist be "scrupulously followed" in order for test results to be admitted. He claims that because the medical technician used povidone iodine and not Acu-dyne the procedures approved by the State Toxicologist were not followed.

■ The fair administration of the blood test can only be shown by: (a) proof of compliance with the State Toxicologist's directions which go to the scientific accuracy of the test, or (b) through expert testimony. *City of Stanley v. Earsley*, 463 N.W.2d 920, 921 (N.D.1990). Section 39–20–07(5), N.D.C.C., states in part:

> The results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and the test was fairly administered, and if the test is shown to have been performed according to methods and with devices approved by the State Toxicologist, and by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist.

This section was designed to allow chemical results into evidence more easily while ensuring that the test performed has been fairly administered. *State v. Schwalk*, 430 N.W.2d 317, 322 (N.D.1988); *Salter v. Hjelle*, 415 N.W.2d 801, 803 (1987). It is important for the test to be fairly administered in order to provide the proper foundation for the test results.

> [R]eliability and accuracy of the results are established by demonstrating compliance with the methods adopted by the state toxicologist. Because the statute permits admission of such evidence without expert witness testimony to establish accuracy and reliability, all the requirements of the statute must be scrupulously met to ensure a uniform basis of testing throughout the State and fair administration.

*Moser v. North Dakota State Highway Comm'r*, 369 N.W.2d 650, 653–54 (N.D. 1985).

The State Toxicologist has drafted Form 104 which provides two sets of directions; one for sample collection and preservation, and one describing the procedure for submitting the sample to the State Toxicologist. *Schwalk*, 430 N.W.2d at 322. The first set of directions ensures that the scientific accuracy of the test result is not tainted by incorrect collection and preservation procedures. *Id.* The second set of directions provides an "evidentiary shortcut for establishing chain of custody." *Id.*

The checklist and the Form 104, signed by the medical technician, clearly state that a nonalcoholic, nonvolatile substance was used. This was not rebutted by Kummer at the hearing by any evidence. The February 1991 memorandum to emergency room personnel does not explicitly displace the earlier memorandum which requires nonalcoholic, nonvolatile disinfectants. It merely states that Acu-dyne can be used for this procedure. It does not state that Acu-dyne is to be the only skin disinfectant used.

This case can be distinguished from *Glaspey v. Backes*, 462 N.W.2d 635 (N.D. 1990), in which this Court reversed a suspension of driving privileges. In *Glaspey*, the medical lab technician who drew the blood testified at the hearing. The documents prepared by the technician indicated that povidone iodine had been used as the disinfectant. On cross-examination, however, the technician admitted that she did not know if the povidone iodine contained alcohol or ethyl alcohol. The Court reversed stating that "[a]bsent contrary evidence, we cannot assume that the povidone iodine swab was not in combination with an alcohol substance." *Id.* at 637.

■ In this case, we have no such conflicting evidence. The form clearly states that a nonalcoholic, nonvolatile substance was used, and there is no evidence to the contrary. We will not second guess medical technicians who sign documents stating that a nonalcoholic substance was used, without evidence to indicate the contrary.

■ We agree with the Director that the memorandum issued by the State Toxicologist cannot be interpreted to require that only Acu-dyne disinfectant must be used by a nurse or medical technician when drawing blood. As indicated in *Glaspey*, the

State Toxicologist had reason to be concerned about use of certain solutions which contain alcohol and may cause an analysis to be incorrect. The State Toxicologist has approved the use of Acu-dyne, but has not forbidden the use of other solutions which do not contain alcohol. The use of a nonalcoholic, nonvolatile solution still conforms with the procedure required by the State Toxicologist.

We affirm the decision of the district court.

ERICKSTAD, C.J., and VANDE WALLE, LEVINE and MESCHKE, JJ., concur.