Michael J. McNAMARA, Petitioner
and Appellant,

v.

DIRECTOR OF NORTH DAKOTA DE-
PARTMENT OF TRANSPORTATION,
Respondent and Appellee.

Civ. No. 920293.

Supreme Court of North Dakota.

May 26, 1993.

Vince H. Ficek (argued), Reichert, Buresh, Herauf & Ficek, PC, Dickinson, for petitioner and appellant.

Michele G. Johnson (argued), Atty. General's Office, Bismarck, for respondent and appellee.

NEUMANN, Justice.

Michael J. McNamara appeals from a judgment entered by the District Court for Stark County affirming the administrative suspension of his driving privileges under the provisions of Section 39–20–05(2), N.D.C.C. We affirm.

McNamara was arrested for driving under the influence of alcohol, in violation of Section 39–08–01, N.D.C.C., in the early morning hours of March 29, 1992. He promptly requested an administrative hearing prior to the suspension of his driver's license by the Director of Transportation (DOT). After the hearing, the administrative hearing officer suspended McNamara's license. McNamara appealed that decision to the District Court for Stark County, which affirmed the DOT's decision. This timely appeal followed, raising five issues: (1) whether the arresting officer had a reasonable and articulable suspicion to stop McNamara, and probable cause to place McNamara under arrest; (2) whether there was sufficient evidence presented at the administrative hearing to determine if the blood test was fairly administered; (3) whether McNamara received a fair and impartial hearing at the administrative level; (4) whether McNamara should have been advised of his right to counsel and his right to an independent test before being subjected to a blood test; and (5) whether the administrative hearing officer violated Section 39–20–05(5), N.D.C.C., by rendering his decision the day after the administrative hearing.

Our review of McNamara's appeal from the district court decision is governed by the Administrative Agencies Practice Act. Chapter 28–32, N.D.C.C. In such an appeal, we review the record of the administrative agency rather than the record of the district court. *North Dakota Dep't of Transp. v. DuPaul*, 487 N.W.2d 593, 595 (N.D.1992). Our review is limited to whether: "(1) the findings of fact are supported by a preponderance of the evidence, (2) the conclusions of law are sustained by the findings of fact, and (3) the decision is supported by the conclusions of law." *Ehrlich v. Backes*, 477 N.W.2d 211, 213 (N.D.1991). When reviewing factual determinations made by the agency, "[w]e do not make independent findings or substitute our judgment for that of the agency." *Boyce v. Backes*, 488 N.W.2d 45, 47 (N.D. 1992). Instead, "we consider whether the agency reasonably reached its factual determinations from the greater weight of all the evidence." *Id.*

## I. THE STOP AND ARREST

On appeal, McNamara argues that the arresting officer, Sergeant Nelson, did not have "reasonable grounds" to stop him, and that after the stop, Nelson did not have probable cause to arrest him for driving under the influence. At the DOT hearing, Nelson testified that he observed McNamara driving a substantial distance in the

middle turn-only lane as McNamara approached him on a three-lane road (the turn-only lane being the middle lane). Nelson also testified that he clocked McNamara on radar travelling seven miles over the speed limit. Nelson stated that these were the two reasons for the stop. McNamara tried to refute that evidence at the hearing by offering into evidence a videotape taken from Nelson's patrol car during the incident, and also by supplying the hearing officer with a videotape he took of the same road in the same conditions shortly after his arrest. It is McNamara's contention that the road on which he was travelling was so poorly marked at the time of his arrest that neither he nor Nelson could have observed the white arrows and other markings of the turn-only lane. McNamara also testified that he had his radar detector on immediately before Nelson stopped him, and that it did not detect radar when approaching Nelson, so Nelson could not have been tracking his speed with radar.

We have viewed both videotapes. At the very beginning of the tape taken from Nelson's patrol car, Nelson is turning around on the road to pursue McNamara. While Nelson is making his U–turn, a white arrow indicating a turn-only lane is clearly discernible in the middle of the road. Following Nelson's U–turn, the road expands into a four-lane road. Thus, the absence of markings on the three-lane road is no longer possible to review. More importantly, the tape offered by McNamara discloses at least six white turn arrows in a middle turn-only lane before the road develops into a four-lane road. Thus, it appears that there was evidence to support the administrative hearing officer's conclusion that Nelson observed McNamara driving in the middle turn-only lane.

Concerning the speed of McNamara's vehicle, the hearing officer was presented with conflicting testimony from McNamara and Nelson. Despite McNamara's constant insistence on appeal that Nelson did not mention speed as one of the reasons for the stop, we find various references to speed in Nelson's testimony. In fact, at one point Nelson unequivocally testified that speed was one of the two reasons for stopping McNamara. The hearing officer obviously found Nelson to be more credible, and chose to believe Nelson over McNamara.

As mentioned previously, this Court will not substitute its judgment for the agency's, nor will we make independent findings. While McNamara is correct in his argument that there was evidence introduced at the DOT hearing which conflicts with the hearing officer's findings of fact, we must point out that there was also evidence supporting the hearing officer's findings. Thus, as the findings are not against the greater weight of the evidence, we will not disturb them on appeal.

■ McNamara repeatedly refers to the standard for a stop as "reasonable grounds." However, " '[r]easonable grounds' to believe an offense has been committed is synonymous with 'probable cause.' " *Salvaggio v. North Dakota Dep't of Transp.*, 477 N.W.2d 195, 197 (N.D.1991) (quoting *Wolf v. North Dakota Highway Comm'r*, 458 N.W.2d 327, 329 (N.D.1990)). This Court has previously announced the standard police must satisfy to stop a vehicle, and it is termed "reasonable and articulable suspicion," not probable cause.

> "Police may briefly stop an auto to investigate a reasonable suspicion that a driver may be violating a law, without waiting for an actual violation or an actual injury to someone. An officer need only have enough information for an articulable and reasonable suspicion that the driver has or may be violating the law."

*State v. Nelson*, 488 N.W.2d 600, 602 (N.D. 1992) (citations omitted). Reasonable and articulable suspicion is not as stringent a standard as probable cause. Thus, McNamara's terminology is incorrect. Nelson only needed to possess a reasonable and articulable suspicion to stop McNamara, and the speeding and driving in a turn-only lane were sufficient to raise such a suspicion.

■ McNamara also asserts that Nelson lacked probable cause after the stop to

arrest him for driving under the influence. We disagree. Probable cause has been defined as follows:

"In determining whether or not there is probable cause to make an arrest, an officer need not possess knowledge of facts sufficient to establish guilt. *State v. Goeman*, 431 N.W.2d 290 (N.D.1988). Probable cause exists when the facts and circumstances within a police officer's knowledge and of which he had trustworthy information are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed. *State v. Prigge*, 437 N.W.2d 520 (N.D.1989)."

*State v. Woytassek*, 491 N.W.2d 709, 711 (N.D.1992).

At the DOT hearing, Nelson testified that after he approached McNamara's vehicle, he detected the odor of alcohol. After requesting McNamara to enter the patrol car, Nelson determined the source of the odor to be McNamara. Nelson also testified that McNamara admitted to Nelson that he had been drinking. Nelson said that McNamara failed the gaze nystagmus test, although it was close. McNamara did recite his alphabet correctly, but he made various mistakes when counting backward from 86 to 70. McNamara was notably unsteady during the walk-and-turn test, breaking his feet apart once, raising his arms to maintain his balance on occasion, and incorrectly turning after the first nine steps. Much of this conduct appeared on the video tape. Nelson then gave McNamara an Alco–Sensor test, which he failed.

Nelson based his decision to arrest McNamara on these circumstances and the results of the sobriety tests. We conclude that the combination of the above factors gave Nelson probable cause to arrest McNamara for driving under the influence. *State v. Prigge*, 437 N.W.2d 520, 521–22 (N.D.1989) (an officer has probable cause to arrest a motorist for driving under the influence when, among other things, the motorist fails various field sobriety tests).

## II. EVIDENCE OF A FAIR ADMINISTRATION OF THE BLOOD TEST

■ McNamara makes several assertions regarding the sufficiency and validity of the evidence introduced by the hearing officer to prove the results and fair administration of the blood test. First, McNamara argues that several of the exhibits introduced were not original documents or properly certified copies, and therefore should not have been admitted or considered by the hearing officer. We will begin with McNamara's contention that the test results should have been excluded from the evidence because the operational checklist [1] was not certified by the clerk of the district court.

We answer this argument by referring McNamara to *State v. Schwalk*, 430 N.W.2d 317 (N.D.1988). Justice Levine, speaking for this Court, offered a complete and thorough explanation of the admissibility of blood test results. In *Schwalk*, it was reiterated that Section 39–20–07, N.D.C.C.,[2] governs the admissibility of

---

1. An operational checklist identifies the various steps that must be taken when administering a chemical test. It contains the State Toxicologist's approved methods for conducting such tests. The checklist or directions are reproduced in a subsequent part of this opinion.

2. The portions of the statute relating to blood tests provide:

*"Interpretation of chemical tests.* Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor, drugs, or a combination thereof, evidence of the amount of alcohol, drugs, or a combination thereof in the person's blood at

the time of the act alleged as shown by a chemical analysis of the blood, breath, saliva, or urine is admissible. For the purpose of this section:

\*　\*　\*　\*　\*　\*

"5. The results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and the test was fairly administered, and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist, and by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist. The state toxicologist is authorized to approve satisfactory devices and methods of chemical analysis and de-

chemical test results in both criminal and civil actions. *Id.* at 321. Further, we held that, in accordance with 39–20–07(5), test results cannot be admitted unless a fair administration of the test is proved. *Id.* at 322.

We then turned our attention to Form 104, drafted by the State Toxicologist, and used when blood samples are drawn for testing. Form 104 sets forth the checklist which contains two components. The first "ensures that the scientific accuracy and reliability of the test are not affected by improper collection or preservation of the blood sample." *State v. Schwalk,* 430 N.W.2d at 322. The second component "provides an evidentiary shortcut for establishing chain of custody." *Id.* The directions for the collection and submission of blood samples, or the checklist, provide:

"1. Use a sterile, dry, clean syringe and needle, and non-alcoholic, non-volatile, skin disinfectant.

"2. Remove stopper from vial before filling. These vials do not have a vacuum.

"3. If possible place 10 ml of whole blood or other fluid specimen into the vial and replace the stopper.

"4. Invert the vial several times to mix the chemical and prevent clotting.

"5. Fill in name of subject, date, time and your name or initials on the label. Place it over the top and down the sides of the vial.

"6. Fill in the top part of this form and place it and the sealed vial in the mailing container.

"7. Place cotton or tissue paper on top of the vial. Replace the metal screw cap.

"8. Affix the mailing container seal by placing it over the metal cap and down the cardboard sides.

"9. Affix the return address label around the mailing container over the ends of the seal."

Also contained on Form 104 is a section to be filled in by the nurse or medical technician drawing the blood. This individual must certify that the seal was intact, that the syringe was sterile, dry, and clean, and that a nonalcoholic, nonvolatile skin disinfectant was used. This is basically the first of the nine steps on the checklist. In *Schwalk* we noted, however, that there is not an area on Form 104 where the officer or medical personnel can certify that the other eight steps were complied with. This deficiency has been noted before in *State v. Reil,* 409 N.W.2d 99, 103 n. 4 (N.D.1987). In *Schwalk,* we concluded that "[a]bsent such a written certification that all of the State Toxicologist's directives for sample collection have been followed, Form 104 does not on its face establish fair administration of the test, and the State must therefore do so by other evidence." 430 N.W.2d at 323. Thus, even if the checklist on Form 104 had been a certified copy from the district court clerk, under *Schwalk,* the DOT still would have been compelled to produce other evidence of compliance with the State Toxicologist's approved methods. Relying on a certified checklist alone would not have been sufficient. McNamara's argument here is misplaced.

termine the qualifications of individuals to conduct such analysis, and shall issue a certificate to all qualified operators who exhibit the certificate upon demand of the person requested to take the chemical test.

\*　\*　\*　\*　\*　\*

"8. . A certified copy of the analytical report of a blood, urine, or saliva analysis issued by the office of the state toxicologist must be accepted as prima facie evidence of the results of a chemical analysis performed under this chapter.

\*　\*　\*　\*　\*　\*

"10. A signed statement from the nurse or medical technician drawing the blood sample for testing as set forth in subsection 5 is prima facie evidence that the blood sample was properly drawn and no further foundation for the admission of such evidence may be required."

Section 39–20–07, N.D.C.C.

We find that the test results were properly admitted because "other evidence" was offered by the DOT to prove fair administration of the blood test. Nelson testified that each and every one of the nine steps on the checklist was followed. Nelson's testimony provided the necessary proof needed to show that the approved methods for conducting the blood test were "scrupulously" met. *Id.* We have acknowledged numerous times that such testimony, if complete, satisfies the fair administration requirement, allowing test results into evidence. *See Schwind v. Director,* 462 N.W.2d 147, 151–52 (N.D.1990); *State v. Sivesind,* 439 N.W.2d 530, 533 (N.D.1989); *Salter v. Hjelle,* 415 N.W.2d 801, 803 (N.D.1987); *Brandt v. North Dakota State Highway Comm'r,* 409 N.W.2d 645, 647 (N.D.1987).

McNamara argues that Nelson's testimony failed to prove compliance with the checklist because there was insufficient evidence to establish that the vial containing McNamara's blood was inverted, as required by the checklist. We find no merit in this argument. McNamara contends that Nelson's testimony indicates that he only inverted the vial one time, and therefore he did not comply with instruction # 4 on the checklist, which states: "Invert the vial several times to mix the chemical and prevent clotting."

Nelson testified two times about inversion of the vial. First, in response to the hearing officer's question, he stated: "Prior to the label, the inversion. Mixed the white powder with [the blood] so it doesn't coagulate." The second time, an exchange between Nelson and McNamara's attorney disclosed the following:

"Q. How did you invert the vial when you mixed the coagulant with the blood?

"A. Just up and down.

"Q. You'll have to describe it.

"A. You don't shake it, you just take and tip it back and forth until the powder solution is dissolved.

"Q. Is that what you did in this case?

"A. Yes.

"Q. You didn't shake it then?

"A. No."

This testimony clearly indicates to us that Nelson did not "shake" the vial to mix the blood with the coagulant, but did, as the instructions direct, invert the vial "back and forth until" the two substances mixed. This does not prove to us that he only inverted the vial once. He simply did not shake, in a more vigorous manner, the vial. Instead, he more gently tipped it back and forth. We find absolutely no evidence that he only inverted the vial once, and are surprised by McNamara's unsupported assertion on this point.

■ McNamara also argues that the blood tests should have been excluded from evidence because the nurse used "Acu-Dyne" as a skin disinfectant, and there is no proof that such a disinfectant is nonalcoholic and nonvolatile, as the instructions on the checklist require. Again, we find such an assertion completely meritless and unsupported. Exhibit 9B in the record is a copy of a certified copy of a memorandum from the State Toxicologist's Office stating that "Acu-Dyne" is a nonalcoholic, nonvolatile skin disinfectant. The memorandum informs emergency room supervisors that "Acu-Dyne" should be used for cleansing skin prior to withdrawing blood from a DUI suspect. This memorandum is in compliance with the statute discussed immediately below, was properly admitted into evidence, and is proof that "Acu-Dyne," the substance used to cleanse McNamara's skin on the night in question, is a nonalcoholic, nonvolatile skin disinfectant.

As for the certification of the rest of the exhibits, we must remind McNamara that the provision under which his DOT hearing was conducted, Section 39–20–05(2), N.D.C.C., and another subsection in the same statute, 39–20–05(4), which is wholly devoted to the introduction of the regularly kept records of the DOT, both allow for the introduction of "a copy of a certified copy" in certain instances. The remaining exhibits in the record from the administrative hearing relating to the validity of the blood test are either certified copies or copies of certified copies, and are in compliance with the above referenced statute. Therefore,

such exhibits were properly admitted and considered by the hearing officer.

## III. FAIR AND IMPARTIAL HEARING

■ McNamara contends that he did not receive a fair and impartial hearing because the entire composition of the DOT hearing process is inherently unfair and biased. He argues that because the hearing officer is an employee of the DOT, and because the hearing officer is both the fact finder and the adjudicator at these hearings, it is impossible for individuals like McNamara to receive fair hearings and due process. In oral argument, McNamara also asserts that such an arrangement violates Section 28–32–12.2(1), N.D.C.C., which states: "No person who has served as investigator, prosecutor, or advocate in the investigatory or prehearing stage of a contested case proceeding may serve as hearing officer."

McNamara failed to raise the possible application of Section 28–32–12.2(1), N.D.C.C., either below or in his brief. Oral argument is too late to assert such an argument for the first time. *State v. Morstad*, 493 N.W.2d 645, 646 (N.D.1992); *Olmstead v. First Interstate Bank of Fargo*, 449 N.W.2d 804, 808 (N.D.1989). Beyond that, there is nothing in the record to suggest that the hearing officer in this case "served as [an] investigator, prosecutor, or advocate in the investigatory or prehearing stage" of this matter. As to McNamara's more general argument that the DOT hearing process is inherently unfair and biased, we have previously held that DOT administrative proceedings, which can result in the suspension of an individual's driver's license, do not violate constitutional rights or due process of law, *Pladson v. Hjelle*, 368 N.W.2d 508, 511 (N.D.1985), and that there must be proof of the hearing officer's prejudgment of the case before that officer can be disqualified, *Mun. Serv. Corp. v. State*, 483 N.W.2d 560, 564–65 (N.D.1992).

## IV. RIGHT TO COUNSEL AND AN INDEPENDENT TEST

The evidence is undisputed that, prior to the taking of his blood sample for testing, McNamara did not receive any information regarding his right to counsel *(Miranda* rights [3]) or his right to an independent test. The only information McNamara received from Nelson following his arrest was that his license would be suspended for one year if he refused to take the test (the implied consent law). McNamara now asserts that due to the failure of Nelson to advise McNamara of these rights, we should reverse the administrative hearing officer's decision. We disagree.

■ While we agree with McNamara that individuals do have the right to an independent chemical test in addition to the test taken at the direction of the law enforcement officer, we must remind McNamara that an officer has no duty to inform a person of the right. "We have held that police have no duty to inform a person of the right to an additional test. *State v. Rambousek*, 358 N.W.2d 223, 230 (N.D. 1984)." *State v. Messner* 481 N.W.2d 236, 239 (N.D.1992).

■ Our discussion of *Miranda* rights in an administrative setting is two-fold. First, the issue of whether chemical tests should be excluded in an administrative hearing because of failure to give the suspect *Miranda* warnings has previously been answered by this Court. In *Pladson v. Hjelle*, 368 N.W.2d 508, we said:

"In *State v. Fields*, 294 N.W.2d 404 (N.D.1980), we stated that the Fifth Amendment privilege against self-incrimination does not apply to implied-consent matters and, furthermore, that if a driver consents to a blood-alcohol test, the results are not 'testimonial' and are admissible into evidence. *See Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (the results of a blood test are 'physical' or 'real'

---

**3.** "Prior to any questioning [in a custodial setting], the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against

him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

evidence, unprotected by the Fifth Amendment privilege). *See also South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); *State v. Mertz*, 362 N.W.2d 410 (N.D.1985); *State v. Kimball*, 361 N.W.2d 601 (N.D.1985)." *Id.* at 513–14 (footnote omitted). Thus, the mere failure to give McNamara his *Miranda* warnings will not result in the suppression of his blood-test evidence in the administrative hearing, nor will it command that his driving privileges be reinstated by the DOT.[4] Further, any other physical evidence, such as his performance on the field sobriety tests, will not be excluded from evidence. *See State v. Fasching*, 453 N.W.2d 761 (N.D.1990).

■ However, our inquiry cannot end here because not all of the evidence introduced at the administrative hearing was physical. There was also evidence introduced by Nelson concerning McNamara's admission that he had been drinking on the night in question. This admission is testimonial in nature, and is the type of evidence that falls under the protection of the Fifth Amendment privilege against self-incrimination. *See, e.g., id.* at 763 (defining and distinguishing "physical" evidence, to which the privilege against self-incrimination does not apply, and "testimonial" evidence, to which the privilege against self-incrimination does apply). Even though evidence may be testimonial in nature, law enforcement officials are only required to give suspects their *Miranda* warnings when the suspects are faced with "custodial interrogations." *Id.* at 763–65. For the purpose of this opinion we will assume, without deciding, that the admission in this case occurred during custodial interrogation.

The admission by McNamara was offered into evidence by Nelson as one of the many factors he used to develop probable cause to arrest McNamara for driving under the influence. *See* section I of this opinion. Further assuming, again without deciding, that such an admission should have been suppressed at the administrative hearing due to Nelson's failure to give McNamara his *Miranda* warnings, there were still numerous other factors remaining which supported the hearing officer's finding of probable cause to arrest. Thus, even if there is an administrative law requirement of advising suspects of their *Miranda* rights, the failure of Nelson to give the warning in these facts amounted to harmless error because probable cause existed without the inclusion of McNamara's admission.

## V. VIOLATION OF SECTION 39–20–05(5), N.D.C.C.

■ McNamara's last argument on appeal is that the hearing officer violated Section 39–20–05(5), N.D.C.C. The pertinent part of the statute reads: "At the close of the hearing, the hearing officer shall notify the person of the hearing officer's findings of fact, conclusions of law, and decision based on the findings and conclusions and shall immediately deliver to the person a copy of the decision."

After McNamara's administrative hearing, the hearing officer advised McNamara and his counsel that the hearing officer was "going to take the information that I have today back to Bismarck and make a written decision tomorrow on this." In response to that announcement, McNamara's counsel simply replied, "Okay." He did not object or question the hearing officer, nor did he draw the wording of Section 39–20–05(5), N.D.C.C., to the hearing officer's attention. Also, the hearing officer assured McNamara that there would be no prejudice to McNamara resulting from the hearing officer's delay in making a ruling. He said: "Mr. McNamara is free to drive until after the decision is made. No problem there." After it was brought to the hearing officer's attention that the form McNamara had only allowed him to drive until

---

**4.** We must note that our holding in this opinion does not affect our prior holdings in *Kuntz v. State Highway Comm'r*, 405 N.W.2d 285 (N.D. 1987), and its progeny. We still recognize a limited right to an attorney in administrative settings when one has been requested by the DUI suspect prior to the chemical test. However, *Kuntz* and its progeny are distinguishable from the present case because McNamara never requested or was denied access to an attorney, nor did he refuse the blood test because his attorney was not present.

the day of the hearing, the hearing officer said: "I'll change that for him." Thus, no prejudice resulted from the delay in the decision. More importantly, McNamara's failure to object at the hearing precludes him from raising the issue in this Court. *State v. Morstad,* 493 N.W.2d at 646; *Olmstead v. First Interstate Bank of Fargo,* 449 N.W.2d at 808.

For the foregoing reasons we affirm the judgment entered by the District Court for Stark County affirming the administrative suspension of McNamara's driving privileges under the provisions of Section 39–20–05(2), N.D.C.C.

VANDE WALLE, C.J., and SANDSTROM, J., concur.

LEVINE, Justice, dissenting.

What good is a statutory right to consult with counsel before deciding to take a chemical test, *Kuntz v. State Highway Comm'r,* 405 N.W.2d 285 (N.D.1987), if a driver is not told of that right? Adhering to my dissenting view in *Fasching v. Backes,* 452 N.W.2d 324, 326 (N.D.1990), I again dissent.

MESCHKE, J., concurs.