**CITY OF GRAND FORKS,**
Plaintiff and Appellee,

v.

**Tammy Lou EGLEY, Defendant**
**and Appellant.**

Crim. No. 950161.

Supreme Court of North Dakota.

Jan. 11, 1996.

Gary E. Euren, Assistant City Attorney, Grand Forks, for plaintiff and appellee.

David D. Dusek, Clark & Dusek, Grand Forks, for defendant and appellant. Appearance by M. Kelly Clark.

VANDE WALLE, Chief Justice.

Tammy Lou Egley appealed from a judgment of conviction entered upon a jury verdict of guilty of driving while under the influence or with a blood alcohol concentration of at least ten one-hundredths of one (.10) percent by weight within two hours of driving in violation of section 8–0205 of Grand Forks City Ordinances.

On November 13, 1994, at approximately 2:00 a.m., Officer Donnie Bryant, a police officer for the City of Grand Forks, was conducting a routine patrol of Riverside Park when he noticed a vehicle parked in the parking lot. At trial, the officer testified that patrolling the parks was routine "[b]ecause the parks are closed at certain hours, and we patrol the parks to make sure nobody is in the parks, causing any damages to the parks, or drinking in the parks." The officer testified that his attention was drawn to the vehicle because it was in the park after closing, which is 11:00 p.m.

Officer Bryant testified that he approached the driver's side of the vehicle, asked the driver for identification, and questioned the driver and passenger whether they realized that the park was closed. As he was speaking to the occupants, Officer Bryant smelled a strong odor of alcohol and asked Egley to speak with him in the squad car. Officer Bryant watched Egley as she walked to the squad car and observed her weaving, not completely picking up her feet, and staggering. When in the squad car, Officer Bryant continued to smell alcohol. Egley told the officer that she had been drinking. She consented to field sobriety tests, which she did not pass to the officer's satisfaction. The officer arrested Egley for driving while under the influence of alcohol and took her to the police station for further testing.

I.

Before trial, Egley filed a motion to suppress evidence. Relying on *State v. Sarhegyi*, 492 N.W.2d 284 (N.D.1992), for support, Egley asserted that the officer did not have the reasonable and articulable suspicion necessary to stop Egley in the parking lot. In opposition to the motion, the City argued that the officer had a reasonable and articulable suspicion to make the stop because Egley was in the park at a time the park was closed to the public. In support of the brief, the City submitted an affidavit by Steve Mullally, Park Superintendent for the Grand Forks Park District, stating that the parks

"are generally closed to the public from mid-October to mid-May of each year" and that "when the parks are open to the public, the open hours are from 6:00 a.m. to 11:00 p.m."

Egley filed a reply brief arguing that the officer did not have a reasonable and articulable suspicion because a publication which was disseminated to the public did not include these hours and that signs with the park's hours were not posted at the park on November 13, 1994. After a hearing, the trial court denied the defendant's motion to suppress, determining that an investigative stop was made and that the officer had a reasonable and articulable suspicion to make the stop because Egley's "vehicle was parked in a city park after the park had closed. The vehicle's position alone was a violation which is enough to create a suspicion." On appeal, Egley claims that the officer did not have a reasonable and articulable suspicion to stop Egley.

▮ Our review of a trial court's disposition of a motion to suppress is well established: "we defer to a trial court's findings of fact and resolve conflicts in testimony in favor of affirmance, recognizing the trial court's superior opportunity to assess credibility and to weigh the evidence." *State v. Ova*, 539 N.W.2d 857, 858 (N.D.1995) [citations omitted]. "A trial court's findings of fact in preliminary proceedings of a criminal case will not be reversed if, after the conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence." *City of Fargo v. Thompson*, 520 N.W.2d 578, 581 (N.D.1994). "Although the underlying factual disputes are findings of fact, whether the findings meet a legal standard, in this instance a reasonable and articulable suspicion, is a question of law." *Ova*, 539 N.W.2d at 858.

▮ We agree with the trial court that the officer acted on reasonable and articulable suspicion. To justify an investigative stop of a vehicle, an officer must have a reasonable and articulable suspicion that the law has been or is being violated. *Ova*, 539 N.W.2d at 858–59; *State v. Hornaday*, 477 N.W.2d 245, 246 (N.D.1991). Reasonable and articulable suspicion is less stringent than probable cause but requires more than a vague hunch. *Ova*, 539 N.W.2d at 859; *McNamara v. North Dakota Dept. of Transp.*, 500 N.W.2d 585, 587 (N.D.1993). The validity of a stop is evaluated under an objective standard: " 'whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect potential criminal activity.' " *Ova*, 539 N.W.2d at 859 (quoting *Hornaday*, 477 N.W.2d at 246).

The Grand Forks Park District's Ordinance No. 52 provides for park "[h]ours of operation":

"Except for unusual and unforeseen emergencies, parks shall be open to the public every day of the year during 5:00 am—11:00 p.m. The opening and closing hours for each individual park shall be posted therein for public information.

It shall be unlawful for any person, or persons (other than city personnel conducting city business therein), to occupy or be present in said park during any hours in which the park is not open to the public.

Any section, or part of the park, may be declared closed to the public by the Park Superintendent at any time and for interval of time, either temporarily or at regular or stated intervals."

▮ Egley alleges that she was not adequately informed of the park's hours because the hours were not posted at Riverside Park on November 13, 1994. In response to the City's assertion that "[t]he facts as presented by the Court at the hearing clearly showed that Ms. Egley was illegally parked in Riverside Park," Egley argued:

"this issue of whether the vehicle was illegally parked goes to the heart of whether reasonable and articulable suspicion existed to make the stop valid in the first place. The City assumes that the car was parked illegally when in fact that very issue should be left to a decision by this Court."

Egley misunderstands the reasonable suspicion standard. The validity of a stop "does not depend upon whether an officer's grounds for the stop ultimately results in a

conviction." *Ova*, 539 N.W.2d at 859 [citing *State v. Smith*, 452 N.W.2d 86, 88 (N.D. 1990) ]. Whether or not the hours were properly posted does not negate the reasonable suspicion that an ordinance was being violated. If indeed the hours were not properly posted, although no evidence was presented to the trial court to support this allegation, that might be a valid defense to a charge of violating the ordinance. But, for our purposes here, we only focus on whether a reasonable person in Officer Bryant's position would have been justified to believe that Egley was violating the ordinance by her presence in the park after 11:00 p.m.

Egley argues that this case is analogous to *State v. Sarhegyi*, 492 N.W.2d 284, 286 (N.D. 1992), in which we determined that the officer did not have a reasonable suspicion to stop Sarhegyi who was leaving the parking lot of a farm implement dealership after being parked there, when "[t]he only bases for [the officer's] suspicions were the time of night, the burglary possibilities, the safety of the occupant, if the car was stolen, if someone needed assistance, and the fact that Sarhegyi began to pull away from him as he entered the lot." We explained that "[a]ll these justifications are either conflicting with [the officer's] further testimony or are legally insufficient bases for reasonable suspicion. . . ." *Id.* This case is easily distinguishable because, unlike in *Sarhegyi*, here it was a violation for Egley simply to be in the park's parking lot after 11:00 p.m. The evidence is sufficient to conclude that the officer had a reasonable and articulable suspicion that Egley was violating the law.

## II.

 The second issue on appeal is whether the trial court erred when it admitted Egley's intoxilyzer test results at trial. Egley argues that the officer administering the intoxilyzer test testified to deviating from the approved method and that the prosecution was therefore required to submit expert testimony that the alleged deviation did not adversely affect the test results before the results could be properly admitted into evidence. N.D. Cent.Code § 39–20–07(5) ["results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and the test was fairly administered, and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist, . . . ."]; *Price v. North Dakota Dept of Transp. Director*, 469 N.W.2d 560, 562 (N.D.1991) [recognizing that the foundation required to show fair administration of the test and admissibility of the test results is a showing that the administration of the test scrupulously complied with the State Toxicologist's approved method or by expert testimony].

On direct examination, Officer Michael Ferguson testified that he administered the intoxilyzer test to Egley "in the manner in which [he was] trained to administer tests on the Intoxilyzer 500[0]." After Officer Ferguson described the steps he took in the administration of the test, the City offered the test results as evidence. Before deciding the admissibility of Form 106–I, the trial court permitted Egley's attorney to voir dire Officer Ferguson:

"*Mr. Dusek:* When did you initially insert the form into the machine?

*The Witness:* When I pushed the start test button.

*Mr. Dusek:* Before the diagnostic or after the first diagnostic test?

*The Witness:* It would be after.

*Mr. Dusek:* After the diagnostic test?

*The Witness:* Yeah.

. . .

*Mr. Dusek:* Your honor, I have to object to this coming in. Officer testified that he inserted the form after that diagnostic test. The approved method states that he must do it before doing the first diagnostic test.

. . .

*Mr. Dusek:* [T]he officer just testified that he inserted Form 106 into the machine after the diagnostic test. The testing procedure, if the correct form, precisely says that you insert that first, before the testing is started, and that was not done.

*Mr. Kalash:* If that's what happened, Your Honor, then I submit that it's a ques-

tion of fact as to whether or not he properly administered the test, which does not make the test result—this document, Exhibit 7, inadmissible. It just raises the issue for the jury whether or not he gave the test and administered the test in the manner in which he was required to administer the test. It doesn't render the document inadmissible.

*Mr. Dusek:* Your Honor, before it gets to the jury, ... the city, in this case, has to prove that the approved methods were followed, and they weren't in this case.

*Mr. Kalash:* Well, just because Mr. Dusek says they weren't doesn't mean it wasn't.

*The Court:* I'll ask the officer to review the test procedure, the middle of the paragraph.

*The Witness:* The middle of this paragraph?

*The Court:* Right.

*The Witness:* Okay.

*The Court:* And again, would you explain, concerning the form, what you did as far as inserting the form into the machine?

*The Witness:* Yes, sir. When I start the test, I push the start test button and it gives me instructions over the digital screen. It tells me when to insert the test record, and I inserted it when it told me to.

*The Court:* Because I believe this—the testing procedure indicates that the display will flash to insert test record, then, it says, before the display time expires, insert the Form 106–I into the instrument. Once the Form 106–I is inserted, the intox-

ilyzer will perform a series of diagnostic checks.

And for this test here, when do you recall inserting the Form 106–I?

*The Witness:* It would have been before the diagnostic checks."

Egley contends that the officer testified to a deviation from the approved method when he stated that he inserted the test record after the diagnostic tests were completed. Furthermore, Egley asserts that the trial court improperly asked questions of the officer and assumed the role of the prosecutor.

 The Rules of Evidence permit the court to interrogate party witnesses. N.D.R. Evid. 614(b). We have recognized two competing concerns when having to determine whether a " 'judge's interrogation of witnesses [is] proper or, conversely, unduly prejudicial to the defendant and therefore an abuse of the judge's discretion, ...' " *State v. Lind,* 322 N.W.2d 826, 840 (N.D.1982) [quoting *State v. Yodsnukis,* 281 N.W.2d 255, 260 (N.D.1979) ]. The two concerns are "the defendant's right to a fair trial and permitting and even encouraging the trial judge to clarify testimony and ferret out elusive facts so long as he does it impartially." *Lind,* 322 N.W.2d at 840. Here, the court did not ask leading questions; rather, we read the record to reflect that the officer did not understand Mr. Dusek's question and that as a result the officer's testimony needed clarification.[1] Moreover, Egley's attorney did not object at the first available opportunity to the trial court's interrogation of Officer Ferguson. *See* N.D.R. Evid. 614(c) ["Objections ... to interrogation by (the court) or to

---

1. The State Toxicologist's Approved Method provides for more than one series of diagnostic checks:

 *"Instrument Preparation*
 To turn the instrument on depress the 'Power' (red) switch. At this stage the instrument will display 'Not Ready'. The instrument should be allowed sufficient time to warm up and *complete a series of diagnostic checks.* When these internal diagnostic checks have been completed the instrument will display 'Ready to Start' as one of the alternating displays. The Intoxilyzer is now ready for a test. If the Intoxilyzer is already displaying 'Ready to Start' the operator may begin the test sequence at this stage.

 *Testing Procedure*
 All available information on the Form 106–I from the name of the subject through the operator's number, should be filled in prior to the test. Before proceeding, the operator must ascertain that the subject has had nothing to eat, drink, or smoke within twenty minutes prior to the collection of the breath sample. To initiate a test depress the 'Start Test' switch. The display will flash 'Insert Test Record'. Before the display time expires, insert Form 106–I into the instrument. Once the Form 106–I is inserted, *the Intoxilyzer will perform a series of diagnostic checks.* Only when these internal diagnostic checks are completed will it proceed to test a sample of room air...." (Emphasis added).

specific questions by (the court) may be made at the time or at the next available opportunity when the jury is not present"]. We believe that the trial judge's questions were designed solely to clarify testimony and that he did not abuse his discretion in asking those questions.

We conclude that the officer did not deviate from the approved method; therefore, the trial court did not err when it admitted the intoxilyzer test results into evidence absent expert testimony.

### III.

■■■ The third issue raised by Egley is that the trial court erred when it denied Egley's motion for judgment of acquittal "based on the court's action of fashioning a special jury instruction after the close of the defendant's case-in-chief which sought to revive the prosecution's case."

At trial, Egley's attorney asked Officer Bryant whether it was a correct statement that "the public did not have a right of access to the park because it was closed...." Officer Bryant testified that the statement was correct. Because Egley was charged under section 8–0205 of the Grand Forks City Ordinance which provides, in relevant part, that "[a] person may not drive or be in actual physical control of any vehicle upon the highways or upon public or private areas to which the public has access within the City of Grand Forks," Egley moved for a judgment of acquittal after the close of the City's case-in-chief, arguing that the City was unable to prove the first element of the offense, that Egley had a right of access to the park.[2]

After taking the motion under advisement, the trial court denied the defendant's motion. The trial court relied on section 39–10–01(2), NDCC, which states "[t]he provisions of this title, or equivalent ordinances, relating to ... driving while under the influence of intoxicating liquor or controlled substances ... apply upon highways and elsewhere," and our interpretations of this statute in *Wiederholt v. North Dakota Dept. Of Transp.*, 462 N.W.2d 445 (N.D.1990), and *State v. Novak*, 338 N.W.2d 637 (N.D.1983). After recognizing that the authorities cited involved private property, the trial court stated:

> "It is this Court's finding that, in this case, that it is not a sufficient basis to dismiss this charge, that the park was not ... legally open, that the park was closed after hours, but I believe the statute and the intent of the legislature is to prohibit driving while under the influence, and that a park ... that is closed after hours is, if not open to the public, at least it is ... a place under 39–10–01 for where the driving while under the influence applies."

Consistent with the trial court's ruling, the jury was instructed on "driving in areas which may be closed."[3]

We conclude that the trial court did not err when it denied the defendant's motion. It was unnecessary for the trial court to rely on section 39–10–01(2), NDCC, because the park is a public place to which the public has the right to access, even though at this particular time Egley was not legally entitled to be in the park because the park was closed. If the instruction was error, under the facts of this case, it was harmless error.

We affirm the judgment of conviction.

SANDSTROM, LEVINE, MESCHKE and NEUMANN, JJ., concur.

---

**2.** The defendant and the trial court interchangeably refer to the city ordinance and section 39–08–01, NDCC. Although the defendant characterizes the two as "identical," the language is not the same. Section 39–08–01 states "public or private areas to which the public has a right of access for vehicular use in this state," whereas the ordinance does not include "a right of."

**3.** The jury instruction, entitled "Driving in Areas Which May Be Closed" stated:

"The law, relating to driving while under the influence or with a blood alcohol content of .10 or greater, applies to places in this state other than to highways and public or private areas but to elsewhere. Our statutes are construed together, to prohibit not only driving on highways or upon public or private areas to which public had right of access for vehicular use, but also to private property and areas such as a closed area generally, in keeping with broad 'elsewhere throughout the state' language of our statutes."